PRISCILLA PAZOLT, trustee,[1] vs. DIRECTOR OF THE
DIVISION OF MARINE FISHERIES & others.[2]

Barnstable. February 8, 1994 - April 20, 1994.

Present: ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

Seashore. Real Property, Littoral property. Shellfish. Municipal Corpora-
    tions, Shellfish. Declaratory Relief. Practice, Civil, Declaratory pro-
    ceeding, Standing. Words, "Aquaculture."

A Superior Court judge properly treated claims concerning the title and
    rights of an owner of littoral property as claims seeking declaratory
    relief. [569-570]
In an action seeking a declaration of rights with respect to certain tidal
    flats, the judge correctly determined that the plaintiff, the owner of the
    adjacent upland, had title to the flats. [570-571]
This court concluded that aquaculture, i.e., the farming of shellfish, is not
    incidental to or reasonably related to or a natural derivative of the pub-
    lic's right to fish, and a member of the public, licensed to plant, grow,
    and take shellfish pursuant to G. L. c. 130, §§ 57 and 68A, had no
    right to engage in aquaculture activities on tidal flats of another. [571-
    573]

CIVIL ACTION commenced in the Superior Court Depart-
ment on February 25, 1991.

The case was heard by John M. Xifaras, J., on motions for
summary judgment.

The Supreme Judicial Court granted a request for direct
appellate review.

William C. Henchy for the plaintiff.

Kenneth W. Salinger (William L. Lahey with him) for
John LaForte.

---

[1] Of The Sea Gull Trust.

[2] The board of selectmen of Truro and John LaForte.

*Thomas A. Barnico*, Assistant Attorney General (*Margaret Van Deusen*, Assistant Attorney General, with him) for Director of the Division of Marine Fisheries.

*Paul V. Benatti*, for Board of Selectmen of Truro, was present but did not argue.

The following submitted briefs for amici curiae:

*Richard S. Emmet* for Conservation Law Foundation & another.

*Michael D. Ford*, Town Counsel, for town of Wellfleet.

*Brian J. Wall* for John Glaze & others.

*John D. Echeverria*, of the District of Columbia, for National Audubon Society.

*Scott Harshbarger*, Attorney General, *Thomas A. Barnico & Margaret Van Deusen*, Assistant Attorneys General, for the Commonwealth.

ABRAMS, J. We again are faced with the issue of the private property rights of a littoral landowner and the public's reserved right of fishing in the intertidal zone. See *Wellfleet v. Glaze*, 403 Mass. 79 (1988). The board of selectmen of Truro (board) granted John LaForte licenses to conduct shellfish propagation and aquaculture on the tidal flats located in front of the plaintiff's motel.[3] After an unsuccessful administrative appeal to the division of marine fisheries, Priscilla Pazolt, the plaintiff, filed a complaint in Superior Court to prevent LaForte from seeding and harvesting shellfish on her tidal flats.

On cross motions for summary judgment, a judge of the Superior Court declared that (1) the plaintiff holds title to the tidal flats; (2) LaForte may not engage in aquaculture between the high water mark and the extreme low water

---

[3]The board awarded LaForte a "shellfish propagation grant" pursuant to G. L. c. 130, § 57 (1992 ed.), and a "shellfish aquaculture grant" pursuant to G. L. c. 130, § 68A (1992 ed.). Section 57 allows the licensee to "plant, grow, and take shellfish . . . in, upon, or from a specific portion of flats or land under coastal waters . . . but not so as to impair the private rights of any person." Section 68A grants the licensee the right to "grow shellfish by means of racks, rafts, or floats in waters of the commonwealth below the line of extreme low water."

mark; (3) the licenses granted pursuant to G. L. c. 130, §§ 57 and 68A (1992 ed.), are invalid to the extent that they permit LaForte to conduct aquaculture activities or construct structures on the tidal flats above the extreme low water mark; and (4) LaForte is permitted to "plant, grow and take shellfish" on the tidal flats without the use of structures. We allowed the parties' request for direct appellate review.[4] We conclude that the portion of the judge's order which permits LaForte to plant and grow shellfish on the plaintiff's tidal flats above the line of extreme low water is in error. We affirm the judgment on all other grounds.

The relevant facts are as follows. The plaintiff owns waterfront land in Truro, on which she operates a seasonal motel catering to tourists of Cape Cod. The beach area and associated recreational opportunities are important to the motel's commercial viability.

On May 31, 1990, LaForte applied for licenses to propagate shellfish and conduct aquaculture in certain tidal flats within Truro. The board initially approved the licenses on June 19, 1990. After a series of public hearings, the board held a final vote to reaffirm its approval of LaForte's application on December 14, 1990.[5]

LaForte proposed to engage in shellfish farming by constructing a series of nursery trays. Aquaculture involves a three-step process. Shellfish seeds are planted in nursery trays, which are filled with sand from the area and placed on two-inch spacer blocks. When the seeds have grown sufficiently, the immature quahogs or oysters are placed directly into the sand of the sea bottom and covered with plastic netting held down by steel bars. The use of nursery trays and netting is necessary to protect the shellfish from natural predators such as crabs, conchs, and moon snails. When the

[4]Amicus briefs were submitted by the town of Wellfleet; National Audubon Society; Conservation Law Foundation and Massachusetts Audubon Society; John Glaze, Dr. David Baker, and Sylvia Harrison; and the Commonwealth of Massachusetts.

[5]The plaintiff did not attend the December 14 hearing, but spoke in opposition to the license at a hearing held on November 2, 1990.

shellfish are large enough to be harvested, they are dug up by hand using shellfishing tools, such as rakes and shovels. LaForte's application designated the means of access to the grant area as "[o]n foot for inspection and maintenance" and "[f]our-wheel drive vehicle for transporting equipment and harvest."

LaForte sought a grant area of approximately two acres. According to the plaintiff, the nursery trays and protective netting would occupy approximately one-quarter acre of tidal flats. At the time the plaintiff commenced her action, LaForte already had planted 150,000 quahog seeds. A Superior Court judge granted a stay pending appeal, allowing LaForte to maintain the structures protecting the quahog seeds.

A. *Jurisdiction.* The plaintiff originally filed suit, pursuant to G. L. c. 130, § 68A (1992 ed.), against the director of the division of marine fisheries (division), appealing from the director's decision to affirm the board's grant of the shellfishing licenses. General Laws c. 130, § 68A, states: "Any person aggrieved by the determination of the [division] . . . under this section may appeal under the provisions of [c. 30A]. Such right of appeal shall be exclusive." General Laws c. 30A (1992 ed.), the State Administrative Procedure Act, provides for judicial review of agency decisions. However, § 68A limits the director's role to reviewing "whether such license or operation thereunder will cause any adverse effect on the shellfish or other natural resources of the city or town."

A Superior Court judge dismissed the claims against the director of the division because the case did not involve questions of environmental impact.[6] The judge determined that the case presented the question of the relative property rights in the tidal flats. The parties do not claim that the issues before us involve questions of environmental impact. The Su-

[6]The plaintiff did not allege that the use of off-road vehicles to harvest the shellfish would result in environmental damage to the coast. That issue, raised by the amicus briefs of the Conservation Law Foundation and the National Audubon Society, is not before us.

perior Court judge's dismissal of the claims against the director of the division was correct.

The defendants assert that the only avenue of relief available to the plaintiff is a civil action in the nature of certiorari, which must be commenced within sixty days. Because the plaintiff did not file suit until seventy-three days after the licenses were issued, the defendants contend that her action is time barred and should have been dismissed for lack of subject matter jurisdiction.

After the dismissal of the G. L. c. 30A claim, another Superior Court judge treated the case as a declaratory judgment action, pursuant to G. L. c. 231A, § 1 (1992 ed.). The defendants assert that the declaratory judgment statute does not confer jurisdiction without an independent claim. They allege that declaratory relief was inappropriate because the plaintiff had no underlying issue which was subject to review. We do not agree.

Declaratory judgment is an appropriate remedy to settle questions of property rights. See G. L. c. 231A, § 2 (1992 ed.) (declaratory judgment procedure "may be used to secure determinations of right, duty, status or other legal relations under *deeds*" [emphasis added]). Cf. *Villages Dev. Co.* v. *Secretary of the Executive Office of Envtl. Affairs*, 410 Mass. 100, 106 (1991) ("A property owner is involved in an actual controversy within the meaning of G. L. c. 231A, § 1, when . . . the use of his property is prevented or impaired by an administrative decision which the owner maintains is invalid"). It is clear that an adjudication of title to tidal flats, as well as the public use of privately held property, is an appropriate subject for declaratory decree. See *Lowell* v. *Boston*, 322 Mass. 709, 740 (1948).

The declaratory judgment statute is to be liberally construed and administered. See G. L. c. 231A, § 9 (1992 ed.). A judge enjoys some discretion in deciding whether a case is appropriate for declaratory relief. *Boston* v. *Keene Corp.*, 406 Mass. 301, 305 (1989). Because the plaintiff had independent claims concerning her title and her rights as a prop-

erty owner, the Superior Court judge had jurisdiction to declare the rights of the parties.

B. *Standing.* The Colonial Ordinance of 1641-1647 established that a person holding land adjacent to the sea shall hold title to the land out to the low water mark or 100 rods (1,650 feet), whichever is less. See *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 635 (1979), quoting *Storer* v. *Freeman*, 6 Mass. 435, 437 (1810).

The judge determined that the plaintiff's first deed "identified the southwesterly boundary as running by the sea." He found that the first deed "conveyed the flats as well as the upland." The parties agree with this portion of the judge's findings. The judge then noted that in "subsequent deeds there is some ambiguity in the title since the boundary is described with conflicting terms, 'highwater mark — Provincetown Harbor.'"

The defendants allege that the language referring to the "highwater mark" proves that the tidal flats were severed from the upland. The judge examined all the deeds in the plaintiff's chain of title. He determined that there was no evidence of a separate conveyance of the plaintiff's tidal flats.[7] The judge determined that LaForte "failed to demonstrate that the flats were not conveyed with the upland or that the flats were severed from the upland." There was no error.

The "presumption of law is, that title to the flats follows that of the upland on which they lie, and proof of title to the upland established a title to the flats." *Porter* v. *Sullivan*, 7 Gray 441, 445 (1856). "[A]n owner may separate his upland from his flats, by alienating the one, without the other. But such a conveyance is to be proved, not presumed, and therefore ordinarily proof of the title in the upland thus bounded carries with it evidence of title in the flats." *Valentine* v.

---

[7]The plaintiff submitted an affidavit from a land survey expert, attached to her motion for summary judgment. The defendants moved to strike the expert's affidavit. There is no ruling on the defendant's motion on the record before us. The judge analyzed the deeds in the plaintiff's chain of title. In his findings, the judge did not rely on the opinion of the expert. We, therefore, do not consider the opinion of the expert.

*Piper*, 22 Pick. 85, 94 (1839). "Since the passage of the ordi-
nance, a grant of land bounding on the sea shore carries the
flats in the absence of excluding words." *Commonwealth* v.
*Roxbury*, 9 Gray 451, 524 (1857). The judge correctly deter-
mined that the plaintiff had title to the flats and conse-
quently she had standing to bring a complaint.[8]

C. *The validity of the licenses.* The central question is
whether aquaculture is an activity protected by the Colonial
Ordinance of 1641-1647. The Colonial Ordinance of 1641-
1647 extended private titles to encompass land to the low
water mark, expressly reserving certain public rights in the
seashore. See *Michaelson* v. *Silver Beach Improvement
Ass'n, Inc.*, 342 Mass. 251, 253 (1961). The public retains
the rights of fishing, fowling, and navigation. *Id.* The public's
right to fish includes the right to dig for shellfish. See *Well-
fleet* v. *Glaze, supra* at 84; *Weston* v. *Sampson*, 8 Cush. 347,
355 (1851). However, it does not include the right to affix
permanent structures to the soil. See *Locke* v. *Motley*, 2
Gray 265, 267 (1854) (dictum).

The private property rights of coastal owners in the tidal
area may be subordinate to the public's right if the public
purposes are reasonably related to the protection or promo-
tion of fishing or navigation. In those circumstances, public
rights may prevail and the owner is not entitled to compensa-
tion. See *Crocker* v. *Champlin*, 202 Mass. 437, 441 (1909);
*Home for Aged Women* v. *Commonwealth*, 202 Mass. 422,
435 (1909). The defendants assert that the right to conduct
aquaculture is "reasonably related to," and a "natural deriv-
ative" of the public's right to fish.[9]

---

[8]The defendants and amici argue that, even if the plaintiff owns the
tidal flats below the high water mark, her property extends no further than
the mean low water mark. In *Rockwood* v. *Snow Inn Corp.*, 409 Mass.
361, 370 (1991), the court left open the question whether the proper mea-
sure of the low water mark to which littoral property may extend is the
mean low water mark or, instead, is the extreme low water mark. We do
not reach the issue because G. L. c. 130, § 68A, explicitly states that
aquaculture is authorized only "below the line of extreme low water."

[9]The test for whether an activity is protected by the Colonial Ordinance
has been variously described in our decisions and in an Opinion of the

The judge, relying on the concurring opinion in *Wellfleet* v. *Glaze, supra* at 89, ruled, in the words of Justice O'Connor that, "[a]quaculture is not fishing, nor can it legitimately be considered a 'natural derivative' of the right to fish . . . ." We agree.

General Laws c. 130, § 1 (1992 ed.), defines the verb "to fish" as follows: "to take or to attempt to take fish by any method or means, whether or not such method or means results in their capture." By contrast, Webster's Dictionary defines the verb "to farm" as, "to grow or cultivate in quantity <~shellfish>." Webster's New Collegiate Dictionary 450 (9th ed. 1991). In addition, Webster's defines the noun "farm" as "a tract of water reserved for the artificial cultivation of some aquatic food; as an oyster farm." Webster's Third New Int'l Dictionary 824 (1961).

Activities which have been classified as reasonably related to the public's right to fish are those which are necessary or incidental to the right to fish. The public's right to fish includes reasonable access to privately held tidal flats for the purposes of fishing. See *Packard* v. *Ryder*, 144 Mass. 440, 441 (1887). See also *Weston* v. *Sampson, supra* at 355 (right of access by boat to dig for clams); *Barry* v. *Grela*, 372 Mass. 278, 279 (1977) (right of access on foot for purposes of fishing). In addition, the public may use "lines, seines, spears, nets and any of the ordinary and usual modes of catching fish . . . ." *Locke* v. *Motley, supra* at 267.

Aquaculture is a contemporary method of farming shellfish. We conclude that it is not incidental to or reasonably related to or a natural derivative of the public's right to fish. See *Wellfleet* v. *Glaze, supra* at 90 (O'Connor, J., concurring). See also *Butler* v. *Attorney Gen.*, 195 Mass. 79, 83

Justices. See, e.g., *Opinion of the Justices*, 365 Mass. 681, 687 (1974) (public has reserved right to fish and any "natural derivative" thereof); *Crocker* v. *Champlin*, 202 Mass. 437, 441 (1909) (public right extends so far as is "reasonably necessary" in the interests of navigation); *Wellfleet* v. *Glaze, supra* at 89-90 (O'Connor, J., concurring) (public right may interfere with private rights if it is "reasonably related" to or a "natural derivative" of the right to fish).

(1907) (public right to navigation does not include right to bathe on the beach); *Locke* v. *Motley, supra* at 267 (dictum) (right to fish does not include right to place stakes in the soil of another); *Porter* v. *Shehan,* 7 Gray 435, 437 (1856) (right to dig for shellfish does not include right to take soil as fertilizer).

We remand this matter to the Superior Court where a judgment is to be entered declaring that the Superior Court had jurisdiction to determine that: the plaintiff's title includes the tidal flats as well as the upland; aquaculture is not fishing protected by the Colonial Ordinance of 1641-1647; LaForte cannot plant, grow and cultivate shellfish on the plaintiff's tidal flats; LaForte's license pursuant to G. L. c. 130, § 57 (1992 ed.), allows him to dig for and take shellfish from the tidal flats; and LaForte's license, pursuant to G. L. c. 130, § 68A, allows him to engage in aquaculture activities below the line of extreme low water. We remand the case to the Superior Court for a declaration consistent with this opinion.

*So ordered.*