Elaine I. Sheftel & another[1] *vs.* John S. Lebel & others.[2]

No. 95-P-1403.

Suffolk. April 10, 1997. - January 22, 1998.

Present: Warner, C.J., Smith, & Laurence, JJ.

*Deed,* Construction. *Real Property,* Deed, Easement, Littoral property. *Seashore.*

In an action in the Land Court, the judge incorrectly entered judgment extending the plaintiffs' easement, which provided a right of way for "foot travel only" across the defendant's waterfront property, from the mean high water mark to the mean low water mark to allow construction of an elevated walkway and pier, where the language of the instruments creating the easement unambiguously terminated the easement at "mean high water," and where the manifest main purpose of the easement was to grant lawful access to the tidal flats and not to facilitate foot traffic from the upland to the low water mark. [179-183]

Civil action commenced in the Land Court Department on December 20, 1991.

The case was heard by *Peter W. Kilborn,* J.

*Henry S. Levin (Allan E. Levin* with him) for the plaintiffs.

Laurence, J. Over a century and a half ago, Herman Melville noted the irresistible attraction that the seashore holds for our species:

"But look! here come more crowds, pacing straight for the water, and seemingly bound for a dive. Strange! Nothing will content them but the extremist limit of land . . . . No. They must get just as near the water as they possibly can without falling in. And there they stand — miles of them — leagues! Inlanders all, they came from lanes and alleys, streets and avenues — north, east, south, and west.

---

[1]Nancy R. Meinken.

[2]George Hamrah, as trustee of M & M Realty Trust, Bradford L. Smith, and Dianne L. Smith. The defendants did not file a brief or present oral argument.

Yet here they all unite. Tell me, does the magnetic virtue of the needles of the compasses of all these ships attract them thither?" Melville, Moby Dick 2 (Great Books of the Western World ed. 1948) (1851).

The defendants in this case, John S. Lebel et al. (boatowners), who owned property close to but not on Prince Cove in Barnstable, were much like Melville's leagues of inlanders bent on reaching the water. They sought to extend their existing easement across lots bordering on Prince Cove owned by the plaintiffs, Elaine I. Sheftel and Nancy R. Meinken (landowners), to "the extremist limit of land," by constructing an elevated walkway and pier extending from the mean high water line to the mean low water line of Prince Cove in order to reach their boats more conveniently. Objecting on the ground that the extent of the easement was expressly terminated by relevant deeds at the "mean high water" mark, the landowners sought a declaration in the Land Court vindicating their right to prevent the proposed extension.

A judge of that court, seeing ambiguity and inconsistency in the language creating the easement and finding that the boatowners experienced undue difficulty in reaching their boats moored in the deeper waters of Prince Cove, ruled that the boatowners' easement rights had to be extended to mean low water and that they were entitled to construct the proposed walkway and pier for the reasonable enjoyment of their easement. We conclude that the judge's enlargement of the linear extent of the easement was unwarrantable, given the clarity of the instruments creating the easement. We accordingly reverse the judgment entered in favor of the boatowners, without addressing the issue of the permissible scope of use of the easement.

The landowners' littoral properties are subject to an easement that is appurtenant to and benefits the adjacent inland properties of the boatowners.[3] Each of the parties' deeds contains a reference to the easement, which the common grantor consistently described as "[a] twenty (20) foot easement as shown on [a specifically identified and recorded] plan extended to mean high water . . . [which is] a right of way for foot travel only for the benefit of [the boatowners' lots] as shown on said plan to and

---

[3]The facts are taken from the judge's findings, which are uncontroverted by the landowners.

from Prince Cove."[4] Although Lebel never used the easement during the twelve years preceding this action, the Smiths and the Kurlands[5] did make periodic boating use of the easement, leaving a canoe or dinghy at the upland, or high water, edge of the tidal flats and using it to reach moorings they had in the deeper water of Prince Cove. At low tide, this often involved dragging the small boats to the low water line or foot traffic back and forth over the flats to reach boats moored below the low water line.

The flats are composed of marsh grass near the high water line and bare soil or mud over the balance of the flats to the low water line. The marsh grass affords reasonably secure foot passage, but walking over the mud can be difficult, involving a continued risk of slipping and falling, especially when manhandling even a small boat. There has been no material change in the flats since any of the parties took title.

In May, 1991, boatowner Lebel, having obtained numerous permits, proposed to construct an elevated walkway and pier so as to extend the easement. With a width of approximately four feet, the proposed walkway would begin at a point above the mean high water line where the easement meets the shoreline, proceed across the mean high water line and the flats, and terminate at the mean low water line, for a total distance of eighty-four feet. Three poles would be positioned approximately twenty feet out from the end of the pier to which pulleys could be attached to facilitate access to boats moored further out in the cove.

On December 20, 1991, the landowners commenced an action seeking a declaration as to the extent of the easement and a permanent injunction prohibiting Lebel from constructing the

---

[4]The easement is delineated on the recorded plan referred to by dashed lines, marked "20′ Easement" beginning at a point between lots 3 (Hamrah) and 4 (Smith), marked as "Conservation Easement," and running in a northeasterly direction along the border of lot 5A (Lebel) toward the intersection with lots 1 (Sheftel) and 2 (Meinken). The easement continues along the joint border of lots 1 and 2 in a northeasterly direction, jogging to the southeast at one point and then back in a northeasterly direction, toward Prince Cove. The dashed lines indicating the easement clearly end at another set of dashed lines, running perpendicular in a north/south direction, labelled "Edge of Upland and Marsh." The dashed lines indicating the easement do not continue beyond the dashed lines of the "Edge of Upland and Marsh" into the area between the mean high water and mean low water marks.

[5]Charles and Karen Kurland are the beneficiaries of M & M Realty Trust.

walkway and pier below the mean high water line.[6] The boatowners counterclaimed, seeking a declaratory judgment regarding their right to construct the proposed walkway and pier. After a hearing on the boatowners' motion for summary judgment, a judge of the Land Court ruled, by order dated September 20, 1993, that a "conflict" existed between the easement's explicit terminus reference at mean high water and what he deemed "the manifest purpose" of the easement, foot access to and from Prince Cove. To avoid frustrating that purpose, the judge concluded that the boatowners' rights had to be extended to the mean low water line. The judge denied summary judgment at that point, however, because the issue whether construction of a pier on the tidal flats is reasonably necessary for the enjoyment of the extended easement as construed was a factual one appropriate for trial.

After a view of the locus and a one-day trial, the judge ruled, on May 25, 1995, that the proposed pier would be reasonable, relying on the principle stated in *Sullivan* v. *Donohoe*, 287 Mass. 265, 267 (1934), that "[w]hen an easement or other property right is created, every right necessary for its enjoyment is included by implication." He reasoned that "[w]ithout the pier and walkway, use of the easement is out of character with surrounding properties, difficult, impracticable, and sometimes dangerous . . . . [He also noted] that the pier and walkway are only four feet wide — a width appropriate 'for foot travel only' — and that continued dragging of small boats across the flats — especially through the marsh grass — is environmentally damaging."[7]

The landowners have challenged both of the judge's rulings. As noted above, we agree with their principal argument, that the relevant language of the instruments, coupled with applic-

[6]The landowners also sought a judgment ordering Lebel to remove an elevated wooden stairway that he had already constructed within the easement area above the mean high water line. The judge ruled that, because the slope of the land at the location of the stairway is such as to make passage difficult and dangerous to some, the construction of the stairway was reasonable. The landowners originally appealed the judge's decision as to the stairway, but have since waived their appeal on this issue.

[7]Although the landowners have not challenged any of the judge's findings as clearly erroneous, we discern no evidence in the record regarding environmental damage caused by the boatowners' activities on the easement or the tidal flats.

able rules of construction, unambiguously terminate the easement at the mean high water line and do not authorize its extension to the mean low water line.

The basic principle governing the interpretation of deeds is that their meaning, derived from the presumed intent of the grantor, is to be ascertained from the words used in the written instrument, construed when necessary in the light of the attendant circumstances. *J.S. Lang Engr. Co.* v. *Wilkins Potter Press*, 246 Mass. 529, 532 (1923). *Suburban Land Co.* v. *Billerica*, 314 Mass. 184, 189-190 (1943). *Barchenski* v. *Pion*, 9 Mass. App. Ct. 896 (1980). Similarly, with respect to an easement created by a conveyance, "[t]he extent of [the] easement . . . is fixed by the conveyance," Restatement of Property § 482 (1944); and the "language [used] . . . is the primary source for the ascertainment of the meaning of [the] conveyance." *Id.* at § 483 comment d. See *Murphy* v. *Donovan*, 4 Mass. App. Ct. 519, 527 (1976); *Pion* v. *Dwight*, 11 Mass. App. Ct. 406, 412 (1981); *Lowell* v. *Piper*, 31 Mass. App. Ct. 225, 230 (1991). We are able to begin and end our inquiry here by reference to the explicit language of the easement as set forth in all the relevant deeds. That language irresistibly points to the conclusion that the easement was not intended to and does not extend onto the tidal flats beyond the high water line.

The most telling indication of the intended scope of the easement is seen in the deed descriptions uniformly describing the terminus of the easement across the landowners' lands as "mean high water." This language is particularly instructive when used in a Massachusetts deed, in light of the ancient and unique feature of Massachusetts land law which provides that every owner of land bounded on tidal waters, such as the landowners here, enjoys title to the shore and to the adjacent tidal flats all the way to the low water mark (or one hundred rods, whichever is less), in contrast to the common law principle (followed in almost all of the other States) that private ownership stops at the high water mark. See *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 633-637 (1979). "[A] grant of land bounding on the sea shore carries the flats, in the absence of excluding words." *Commonwealth* v. *Roxbury*, 9 Gray 451, 524 (1857). *Pazolt* v. *Director of the Div. of Marine Fisheries*, 417 Mass. 565, 570-571 (1994).

Although "an owner may separate his upland from his flats, by alienating the one, without the other . . . such a conveyance

is to be proved, not presumed . . . ." *Valentine* v. *Piper*, 22 Pick. 85, 94 (1839). The use of language that explicitly grants less than the law confers is evidence of an intent to separate the upland from the flatland. Massachusetts courts have recognized that tidal flats can be severed from the adjoining upland when parties expressly employ appropriate restrictive terms in an instrument. *Storer* v. *Freeman*, 6 Mass. 435, 437 (1810). *Valentine* v. *Piper*, 22 Pick. at 94. *Commonwealth* v. *Alger*, 7 Cush. 53, 80 (1851). *Castor* v. *Smith*, 211 Mass. 473, 474 (1912). *Boston* v. *Boston Port Dev. Co.*, 308 Mass. 72, 79 (1941). *Lebel* v. *Nelson*, 29 Mass. App. Ct. 300, 303 (1990). Such a severance of upland and tidal rights is the distinct result, with respect to the easement at issue, of the uniformly specific limiting reference to "mean high water" in all the relevant deeds.

The easement's additional term, limiting the right of way to "foot travel only," underscores the propriety of construing the easement in accordance with its literal terms, i.e., as intended to end at the mean high water line and not extend over the tidal flats. The judge found that the unchanged condition of the muddy flats at low tide is of varying firmness. Although testimony indicated that there were areas across the tidal flats that afforded firm footing all the way to mean low water, the judge found that "often" the mud "can . . . lead to the walker sinking in up to his or her ankles." Foot travel over such irregular terrain was found to be difficult, sometimes impractical, and even dangerous. The language used by the grantor (who was presumably familiar with the condition of the tidal flats) limiting the right of way to foot travel is consequently consistent with an intention that the easement lie only across the firmer, upland ground above mean high water. Contrast *Old Colony St. Ry.* v. *Phillips*, 207 Mass. 174, 180-181 (1911) (where deed did not express any particular method of travel, the words "passage way from said creek into Town River" described a broad right of passage by any reasonable method of travel over the flats lying between the creek and the river, whether bare or covered with water).

Finally, the explicit references in all the descriptions of the easement to the recorded plan cement our conclusion. That plan, which is deemed an integral part of the instrument itself, clearly shows the easement ending at the "edge of the upland

and marsh" (see note 4, *supra*). That visual demarcation provides unmistakable confirmation of the grantor's intent as manifested by the limiting words of the conveyance themselves.[8]

[8]The judge accepted the boatowners' contention below that the final words of the easement, "to and from Prince Cove," conflicted with the explicit limiting references to mean high water. The judge thereby implicitly construed "Prince Cove" to mean only the body of water at low tide. We disagree, both as a matter of common usage — i.e., the body of water at high tide is as much "Prince Cove" as it is at low tide — and because we have found no authority in support of such a construction, which appears inconsistent with venerable Massachusetts law on the subject. See *Storer* v. *Freeman*, 6 Mass. at 439 ("when the tide is out, low water mark is the margin of the sea; and when the sea is full, the margin [of the sea] is high water mark"); *Rockwood* v. *Snow Inn Corp.*, 409 Mass. 361, 366-367 (1991). We agree with the landowners that the phrase cannot be read in isolation from the granting language but must be read in its proper context, as part of the instrument as a whole, including the crystal-clear plan. See *Haskell* v. *Friend*, 196 Mass. 198, 201 (1907); *Brooks* v. *Capitol Truck Leasing, Inc.*, 13 Mass. App. Ct. 471, 476 (1982). So viewed, those words must be interpreted as indicating only the direction of the easement and nothing more.

Further, to the extent the deeds be deemed to contain inconsistent descriptions of the interest conveyed by virtue of those words, the issue would be resolved by reference to the accepted principle that the more certain, unequivocal, and particular description must govern. See *Presbrey* v. *Presbrey*, 13 Allen 281, 283 (1866); *Morse* v. *Chase*, 305 Mass. 504, 507-508 (1940); *W.M. Gullicksen Mfg. Co.* v. *MacNeil*, 347 Mass. 568, 575 (1964), citing *Crabtree* v. *Miller*, 194 Mass. 123, 126 (1907) ("[t]he general rule is that where real property is described by a particular and definite description, the addition of an inconsistent general description does not enlarge the grant"); Eno & Hovey, Real Estate Law § 4.31 (3d ed. 1995). Reference to the objectively ascertainable natural boundary mark of the mean high water line is unquestionably more specific than the mention of a body of water of varying dimensions. Compare *Haskell* v. *Friend*, 196 Mass. at 201-202 (specific reference to the "shore" did not control the subsequent general words "bounded westerly by Squam River" since "shore" is an ambiguous description); *Bernard* v. *Nantucket Boys' Club, Inc.*, 391 Mass. 823, 826-827 (1984) (court did not apply the rule that "[w]hen a deed contains two inconsistent descriptions of a parcel of land, the more specific will govern" because reference to property "being entirely enclosed by fences" was not more specific than the call "NORTHERLY by other land of grantor").

We also observe that (a) the evidence in the record does not appear to support the assertion pressed by the boatowners that "[i]t is unlikely the grantor of the easement intended it to be of practical use only at high tide or to be only the means whereby the easement holder could reach the flats" (to the contrary, see discussion *infra* at 182-183); and (b) the boatowners' contention that *Tindley* v. *Dept. of Envtl. Quality Engr.*, 10 Mass. App. Ct. 623 (1980), governs the result here, is misplaced, since in *Tindley* the appellee's easement was far less specific than the one here, containing no limiting language as to

See *Kaatz* v. *Curtis*, 215 Mass. 311, 314 (1913); *Wellwood* v. *Havrah Mishna Anshi Sphard Cemetery Corp.*, 254 Mass. 350, 354-355 (1926); *Dubinsky* v. *Cama*, 261 Mass. 47, 53 (1927); *Labounty* v. *Vickers*, 352 Mass. 337, 349 (1967). Thus, the instruments creating the easement here must be read as providing that the right of way for foot travel went only to the limit of the firm upland at the mean high water mark and as not extending the privilege across the grantor's entire parcel beyond that mark to the mean low water line.

Moreover, no such extension can be presumed to have been intended even if we go beyond the precise language used and the detailed plan referenced to consider the extrinsic evidence of attendant circumstances, as the authorities cited above permit when the language alone does not satisfactorily resolve the issue of a grantor's intent. Aside from the physical condition of the flats, described earlier, the single pertinent factual circumstance of record appears to be the judge's finding that the only practical use of the waterfront in the immediate area is for boating. That fact ties directly to the paramount attendant legal circumstance: namely, that like all privately owned tidal areas in Massachusetts, the locus lying between the mean high and low water marks is and has always been subject to the Public Trust Doctrine. Under that doctrine, the tidal flats are "subject to a reserved easement" in the public as matter of law, *Commonwealth* v. *Alger*, 7 Cush. at 81, whereby all members of the public retain the right to go upon the flats for purposes of fishing, fowling, and navigation. *Michaelson* v. *Silver Beach Improvement Assn., Inc.*, 342 Mass. 251, 253 (1961). See generally Coastal States Organization, Putting the Public Trust Doctrine to Work (National Public Trust Study, 1990); Archer et al., The Public Trust Doctrine and the Management of America's Coasts (1994).

No easement or license would have been needed by the boatowners in order to utilize the tidal flats belonging to the landowners for public trust purposes, including boating. See *Inhabitants of West Roxbury* v. *Stoddard*, 7 Allen 158, 171 (1863); *Barry* v. *Grela*, 372 Mass. 278, 279 (1977). Indeed, the owner of the flats is without power (in the absence of legislative

---

the terminus of the easement but rather providing that it went all the way "to the Annisquam River" over the entire parcel of land owned by the appellant, and, most decisively, since the appellant in *Tindley* did not contest the appellee's position that the easement extended to the low water mark. *Id.* at 624, 627 & n.7.

authorization) to use them in such a fashion as to obstruct or hinder the public's navigation rights. *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. at 636-637.

The public has, however, no right of perpendicular access across private upland property, i.e., no right to cross, without permission, the dry land of another for the purpose of gaining access to the water or the flats in order to exercise public trust rights; doing so constitutes a trespass. See *Slater* v. *Gunn*, 170 Mass. 509, 515 (1898); *Opinion of the Justices*, 365 Mass. 681, 686-688 (1974). See also *Bell* v. *Wells*, 557 A.2d 168, 173-176 (Me. 1989). Thus, an express easement such as the one at issue, granting the right to walk across the private dry land of another to reach the public trust area between the high and low water marks, was essential in order to make such access lawful. That was the manifest main purpose of the easement, not facilitating the boatowners' ability to walk from the upland to the low water mark. There would have been no reason to extend the easement from the upland across the tidal flats for that purpose, because the boatowners were already afforded the right to cross over and utilize that area for boating as matter of law by virtue of the Public Trust Doctrine.

Accordingly, the judgment of the Land Court dated May 25, 1995, is reversed. The matter is remanded to the Land Court for entry of a judgment declaring that the easement at issue across the landowners' properties in Barnstable extends no further than the mean high water mark and that the boatowners do not have the right to construct any proposed walkway and pier[9] across the landowners' properties beyond the mean high water mark to the mean low water mark of Prince Cove without the landowners' consent.

*So ordered.*

---

[9]We note, in this regard, that the public's rights with respect to fishing, fowling, and navigation on and over public trust lands do not encompass the right to affix any permanent structures to the soil of the tidal flats. See *Wellfleet* v. *Glaze*, 403 Mass. 79, 85 (1988); *Pazolt* v. *Director of the Div. of Marine Fisheries*, 417 Mass. at 571.