BRYANT BERNIER & another[1] *vs.* NORMAN FREDETTE
& others.[2]

No. 12-P-1684.

Suffolk. November 6, 2013. - May 6, 2014.

Present: KANTROWITZ, GRAHAM, & MEADE, JJ.

*Real Property,* Boundary, Deed. *Deed,* Construction. *Surveyor. Evidence,*
Expert opinion. *Witness,* Expert.

In a civil action arising from a real property boundary dispute, the Land Court
    judge did not clearly err in adopting the boundary proffered by the plaintiffs
    and concluding that the plaintiffs owned the disputed property. [268-276]


CIVIL ACTION commenced in the Land Court Department on
August 4, 2008.

The case was heard by *Gordon H. Piper,* J.

*Mark Bobrowski* for David Bechtold.

*Richard E. Burke, Jr.,* for Norman Fredette & another.

*Marc R. Deshaies* for the plaintiffs.

GRAHAM, J. This boundary dispute originates from deeds
granted beginning in 1870 and requires us to locate the com-
mon boundary between the plaintiffs' and defendants' Acushnet
properties. The plaintiffs commenced this action seeking to
remove a cloud on their title pursuant to G. L. c. 240, §§ 6-10,
seeking a declaration of the correct location of their common
boundary, and seeking damages for trespass and nuisance. The
defendants filed counterclaims for trespass and nuisance.

Following a three-day trial and a view of the relevant proper-
ties and monuments, the Land Court judge adopted the bound-
ary proffered by the plaintiffs and awarded them nominal dam-
ages for trespass and nuisance. The judge expressly limited the

[1]Judith Bernier.
[2]Maria Fredette and David Bechtold.

judgment to the parties named and served in this proceeding. On appeal, the parties do not pursue any issue regarding their trespass and nuisance claims, and only the boundary dispute is before us on the defendants' appeal. For the reasons that follow, we affirm the decision of the Land Court judge.

*Background.* All the property at issue is located off Hathaway Road in Acushnet and originally was owned by Samuel Wing, whose heirs subdivided the property and conveyed separate parcels over time. The parcels are referred to by the parties pursuant to lot numbers designated on Acushnet Assessors' Map 14 (map 14). The current map 14 is not in the record, but the multiple plans submitted by the parties have adhered to the lot numbers set forth on map 14. The judge attached to his decision the Bernier trial plan of lot 13 and lot 16 submitted by the plaintiffs following trial.[3] To orient the reader and for ease of reference, we attach the relevant part of the trial plan as an Appendix to this opinion.[4]

Samuel Wing's substantial holdings included, at a minimum, what is now identified as lots 8, 13, 16, and 20 on the Appendix. The plaintiffs, Bryant and Judith Bernier, own lot 13, and the defendants each own subdivided portions of lot 16 that abut lot 13 on their western boundaries. Defendant David Bechtold owns the northern portion of lot 16 and defendants Norman and Marie Fredette own the southern portion of lot 16.[5] The Appendix shows the long triangular shaped disputed area of land along the parties' common boundary.[6]

*History of the properties.* The first conveyance of Wing's

---

[3]The judge noted that "[t]he Bernier trial plan lot 13 [and] 16 was prepared for the [plaintiffs] by Silva Engineering Associates, P.C., Civil Engineers, Land Surveyors & Environmental Consultants . . . on October 27, 2010 and submitted to [the Land Court] as addendum A to plaintiffs' post trial memorandum. While the survey is not stamped, it is a useful aid in illustrating lot 16's boundaries as described in this decision. The Bernier trial plan is not evidence. Rather, it illustrates in a consolidated manner a variety of references made in the testimony and admitted exhibits to deeds of record, found monuments, and plans of record."

[4]The Appendix was prepared by the Land Court from the Bernier trial plan.

[5]Stanley and Kathryn Chaberek, who own the intervening portion of lot 16, have settled with the plaintiffs and are no longer parties to this action.

[6]The Fredettes dispute approximately 31,119 square feet and the Bechtolds dispute approximately 3,853 square feet. The Chabereks disputed an overlap of 22,207 square feet.

holdings was of lot 7 by deed dated May 11, 1870. Lot 7 is located far to the west of the lots at issue and does not abut them. Next, on May 13, 1870, the Wing estate conveyed two lots by separate deeds, lot 20 to George L. Russell (recorded March 13, 1871) and lot 16 to Samuel B. Hamlin (recorded October 24, 1873). As described in the deeds, the southeast portion of lot 16's eastern boundary and lot 20's western boundary share a common directional bound (south one and one-half degrees west) and are shown as abutting in the Appendix. In addition, both lots' southern boundaries run from east to west four and three-quarter degrees south. The deeds do not specify whether lot 20 and lot 16 abut one another; while the defendants contend that the lots do not abut, the deed descriptions provide that the southern portion of the eastern boundary of lot 16 at least runs parallel to the western boundary of lot 20 and their southern lot lines run at least parallel to one another. The judge found that the lots do abut one another.

The Wing heirs conveyed lot 8 on January 4, 1899, and, finally, lot 13, the next day, on January 5, 1899. Lot 7 abuts lot 8 on lot 7's eastern bound, lot 8 abuts lot 13 on lot 8's eastern boundary, and lot 13 abuts lot 16 on lot 13's eastern boundary. The May 13, 1870, deed, the content of which is set forth in the footnote,[7] created the boundary between lot 16 and the remainder of Wing's land, now represented by the eastern boundary of lot 13. The judge found that because lot 16 is the senior lot, its location on the ground controls the boundary with lot 13.

The plaintiffs and defendants take different approaches to locating the boundary between lot 16 and lot 13 on the ground. The plaintiffs started with the deed description for lot 16 and located four of the five monuments on the ground. They verified the direction of the northern and western boundaries by examin-

---

[7] "Beginning at a stake in a pine stump, thence east four and one fourth degrees north, forty $^{32}/_{100}$ rods to a stake and stones in the line of Silas H. Collins land, thence south one and one-half degrees west, eighty $^{40}/_{100}$ rods to a stake and stones, thence west four and three-fourths degrees south, twenty-six $^{1}/_{2}$ rods to a stake and stones, thence north ten and one-half degrees east, twenty-nine $^{80}/_{100}$ rods to a stake and stones the northeast corner of Edward G. Dillingham's land, thence north seventeen degrees west, fifty-three and one-half rods to the first mentioned bound. Containing about fourteen acres and sixty-seven rods more or less."

ing abutter deeds, including the deed to lot 20, for consistency along the southern boundary. Explaining that creation of a cranberry bog likely disrupted the fifth monument, they admitted they could not locate that monument on the ground. Consequently, after ascertaining the northern, eastern, and southern boundaries, they relied on the distance and directional calls in the deed to locate the western boundary with lot 13. As placed by the plaintiffs, the disputed property lies to the west of the boundary and is owned by the plaintiffs.

The defendants, on the other hand, first contend that errors in deeds to the western lots, particularly lot 8, cause lot 13, in its entirety, to shift to the west. Next, they purport to locate the western boundary of lot 16, not by surveying all of the monuments described in lot 16, but by focusing on the two courses that comprise the western boundary. They concentrate on the fifth monument, described in the deed as a stake and stones at "the northeast corner of Edward G. Dillingham's land." The Dillingham land in 1870 was comprised of a large lot, partially shown as lots 21 and 22 in the Appendix. The deed description to lot 22 contains abutter calls on its northern boundary but some metes and bound descriptions on its southern and eastern boundaries. Contending that the deed to the Dillingham land was incorporated by reference into the deed to lot 16, the defendants' surveyor purported to locate several of the southern bounds and extrapolated from those the location of Dillingham's northeast corner, confirmed by locating a stake and stones some 100 feet west of the location proposed by the plaintiffs. Pursuant to this line, the disputed property is part of lot 16.

*Discussion.* The location on the ground today of what was described in the 1870 deed of lot 16 presents a question of fact, *Baker* v. *Miller*, 284 Mass. 217, 222 (1933), to be decided "on all the evidence, including various surveys and plans." *Hurlbut Rogers Mach. Co.* v. *Boston & Maine R.R.*, 235 Mass. 402, 403 (1920). "Any competent evidence may be considered in determining the true boundary line between adjoining owners." *Holmes* v. *Barrett*, 269 Mass. 497, 500 (1929) (*Holmes*). It was for the judge to decide whether upon all the testimony and evidence it was more accurate to rely on one expert over another or ancient plans over more recent plans. *Id.* at 502.

"The basic principle governing the interpretation of deeds is that their meaning, derived from the presumed intent of the grantor, is to be ascertained from the words used in the written instrument, construed when necessary in the light of the attendant circumstances." *Patterson* v. *Paul*, 448 Mass. 658, 665 (2007), quoting from *Sheftel* v. *Lebel*, 44 Mass. App. Ct. 175, 179 (1998). "Rules of deed construction provide a hierarchy of priorities for interpreting descriptions in a deed. Descriptions that refer to monuments control over those that use courses and distances; descriptions that refer to courses and distances control over those that use area; and descriptions by area seldom are a controlling factor." *Paull* v. *Kelly*, 62 Mass. App. Ct. 673, 680 (2004). Whenever, in the description of land conveyed by deed, known monuments are referred to as boundaries, they must govern. *Baker*, *supra* at 220. Generally speaking, monuments, including a stake and stones, govern over distances. *Temple* v. *Benson*, 213 Mass. 128, 132 (1912). "The only exception recognized is where, by strict adherence to monuments, the construction is plainly inconsistent with the intention of the parties as expressed by all the terms of the grant." *Ibid.* "If the monument cannot be found and its location cannot be made certain by evidence, the measurements and other provisions of the deed are controlling." *Holmes*, *supra* at 500. "The weight to be given to the fact that certain terms of the deed would be contravened by the location of the [boundary line] was for the judge to decide." *Id.* at 502.

It was the judge's task to determine which, if any, of the parties' approaches correctly located the boundary between lot 16 and lot 13, keeping in mind that the plaintiffs bore the burden of proving by a preponderance of the evidence that they own the disputed property. In reviewing the judge's decision, we note that "[a]n appeal from the Land Court brings before this court only questions of law apparent upon the record. Findings of fact cannot be revised." *Waltham Resources Corp.* v. *Kennedy*, 346 Mass. 765, 765 (1963). "So long as the judge's account is plausible in light of the entire record, an appellate court should decline to reverse it." *Demoulas* v. *Demoulas Super Mkts., Inc.* 424 Mass. 501, 510 (1997) (*Demoulas*).

With these principles in mind, we first note that we agree

with the judge that resolution of this dispute does not require us to locate lots 7 and 8, or lot 13 other than its common bound with lot 16, on the ground. While it is true that lot 7 was conveyed before lot 16, it was quite distant from lot 16 and never abutted it or lot 13. Any errors in the descriptions of lot 7 do not bear on lot 16's western boundary with lot 13. The defendants' insistence that, as the last lot conveyed, lot 13 got "whatever was left" of the Wing property, while perhaps an accurate general statement, is largely irrelevant to the issue before us given that lot 13's boundary with lot 16 was established by the 1870 deed of lot 16 to Samuel Hamlin. The total area of lot 13 is not at issue. Any errors in the westerly lots, created after lot 16, have no bearing on lot 13's pre-existing eastern boundary with lot 16.

The critical determination here is the correct placement of lot 16 on the ground. We think it eminently reasonable to begin, as the plaintiffs did, with the entire deed description for lot 16. At least in the circumstances of this case, purporting to locate the western boundary without verifying it by locating the rest of the boundaries in the deed description is inconsistent with the general rule that "the intention of the parties as expressed by all the terms of the grant is the true canon of interpretation." *Abbott* v. *Frazier*, 240 Mass. 586, 593 (1922).

That said, the plaintiffs' approach to locating the boundary is not without its flaws and we, therefore, undertake to review their approach. Importantly, the parties agree that the first two monuments in the original lot 16 deed have been located on the ground. Right off the bat, however, there is a problem involving the directional call between the first two monuments contained in the deed and the actual direction on the ground of a line between the two monuments. The deed provides for a line running in a northeast direction but the line between the two monuments, as found on the ground, runs in a southeast direction. If a northeast direction is followed, the boundary terminates in the abutting lot 14, which, both parties agree, pre-existed lot 16 and was not owned by Wing or his heirs. That the southeast direction is correct is verified by both the location of the monuments, which dictate over a directional call, and the pre-existing southern boundary of the abutting lot 14.

.

The plaintiffs suggest that the description error is a simple scrivener's error, not all that uncommon in deed descriptions. Because monuments dictate over bearing calls, they propose correcting the deed call to reflect that the northern boundary runs the same course but in a southeast direction where they in fact located the second monument. The plaintiffs then complete the placement of the lot on the ground by locating the remaining monuments according to the deed description.

In addition to changing the direction of the northern boundary, they adjusted the angle of the intersection of the northern and eastern boundaries to accommodate the adjustment of the northern boundary and keep the eastern boundary in line with the original description. It is the plaintiffs' position that the plaintiffs and earlier surveyors of lot 16 failed to make this angular correction and, as a result, erroneously have rotated the lot to the west, causing the overlap into lot 13 and a gap between the eastern boundary of lot 16 and its eastern abutters.

The judge found and we agree that the first course runs in a southeast direction. If for no other reason, this result is required because the Wing heirs could not convey what they did not own. The location of the monuments on the ground requires this result, as was tacitly conceded by the defendants. In addition, the judge found and we agree that the plaintiffs appropriately made the angular correction. Failing to do so would create a gore of unconveyed land between lot 16 and its eastern abutters. In interpreting deeds, it is proper to consider the deeded property in relation to the grantor's remaining property and the improbability, for example, that a grantor would seek to retain relatively useless strips of property. *Ryan* v. *Stavros*, 348 Mass. 251, 259 (1964) (*Stavros*). Furthermore, so far as the record suggests, the heirs never purported to convey such a strip, making it far more likely that they intended lot 16 to abut lots 17 through 20 on their eastern boundary. "[T]he subsequent action of the parties" may be considered in resolving a boundary dispute. *Ellis* v. *Wingate*, 338 Mass. 481, 485 (1959) (*Ellis*).

The judge's finding that lot 16 and lot 20 abut further supports the plaintiffs' placement of the eastern boundary. The defendants have not shown that conclusion to be clearly erroneous. The second course of lot 16 runs south, one and one-half degrees

west eighty and ⁴⁰/₁₀₀ rods to a stake and stones. Similarly, lot 20's western boundary runs north one and one-half degrees east. None of the theories offered by the defendants would place lot 16 to the west of, but parallel to, lot 20. Their only surveyed plan, submitted as a chalk at trial, did not put lot 20 or, for that matter, even the eastern boundary of lot 16, on the plan.

In arguing that there was an intentional gap created between lot 16 as conveyed to Samuel Hamlin in 1870 and Wing's eastern abutters, the defendants point out that the western bound of lot 18, created in 1911 (north six degrees east), is four and one-half degrees off from lot 16's eastern boundary description (south one and one-half degrees west), suggesting they were not intended to abut. It is not clear that a four and one-half degree difference some forty-one years later compels a conclusion that lot 18 does not abut lot 16. Both experts testified that magnetic declination changes over time. Moreover, the lot 18 deed also describes the western boundary as "by the land of James B. Hamlin." There was testimony that James Hamlin was Samuel Hamlin's son. Had a gap remained, lot 18 would have abutted the remaining land of Samuel Wing or his heirs.[8] We cannot say on this evidence that the judge erred in concluding that lot 16 was intended to abut what is now lot 18 when lot 16 was created in 1870. Although the defendants contend little weight should be given this result because the lots to the east, other than lot 20, were created after lot 16, where a deed is "ambiguous in effect," relevant extrinsic evidence bearing on intent, "such as the circumstances with respect to the ownership of adjacent parcels, the contents of other instruments in the chain of title, and the subsequent action of the parties," may be considered in resolving a boundary dispute. *Ellis, supra.*

The judge, who conducted a view, accepted the lot 16 south-easterly monument as found by the plaintiffs, despite the fact that the distance call between the second and third bound, as found on the ground by the plaintiff's surveyor, is short by six rods or close to 100 feet. Even considering the limited technol-

---

[8]We note that the judge did err in finding that the deed describes the westerly boundary of lot 18 as running south two degrees east and bound by the land of Wing; lot 18 is described as the second lot in the deed and the western boundary runs north, six degrees east, in east line of land of James B. Hamlin.

ogy available in 1870, 100 feet is undoubtedly a large gap. Nonetheless, the judge was satisfied that the stones and stake remnant located in the southeast corner by the plaintiffs' surveyor were consistent with the monument described in the deed and concluded that the plaintiffs had correctly located the southeast corner. Moreover, if the iron pipe located five and seven-tenths rods to the south and relied on by a previous surveyor marked the proper location, the boundary would extend into lot 27 some fifty feet even according to the defendants. The Wing heirs never owned lot 27. We further note that the line is short about the same distance as the distance between the northeast monument called for in the deed and the monument as found on the ground. As monuments control over distances, we cannot say that the judge clearly erred in concluding that the plaintiffs properly located the southeastern "stones & stake" as described in the deed.

The deed next calls the southern boundary to run west, four and three-quarter degrees south for twenty-six and one-half rods to a stake and stones in the southwest corner of lot 16. The plaintiffs' expert testified that stones, but no stake, were found marking the southwest corner twenty-seven rods from the southeast corner, and iterations of plans dating back to 2008 indicate that stones were found on the ground. It does not appear that a stake was found. While the defendants assert that the judge did not view this monument, they do not suggest that they asked the judge to view the area and that he declined. The defendants further argue that the plaintiff's expert only weakly testified that the correct monument had been found, but it was for the judge to decide what weight to give the testimony. Moreover, the judge noted that the southern boundary of lot 16 as located by the plaintiffs continues the southern boundary of lot 20, conveyed on the same day as lot 16, both running westerly four and three-quarter degrees south and apparently serving as the southern boundary of Wing's land and further supporting the judge's finding that the stones found by the plaintiffs are the correct monument.

The defendants assert that they correctly located the southwest monument of lot 16 to the south of the location identified by the plaintiffs not by locating all the monuments described in the

lot 16 deed but, rather, by locating the southeast corner of Dillingham's land and asserting that it also constitutes the southwest corner of Wing's land. There is no reference in the deed to lot 16 to Dillingham's southeast corner. Moreover, the judge, we think appropriately, rejected the landmarks relied on by the defendants to locate the Dillingham southeastern corner both as inconsistent with the Dillingham deed and because the distances, including a boundary of over 4,000 feet, were not surveyed.[9] We discern no clear error in rejecting the defendants' proffered location of the lot 16 southwest monument and adopting the plaintiffs' location of the southern boundary of lot 16.

From the fourth monument in the southwest corner, the deed directs the boundary "north ten and one-half degrees east, twenty-nine $^{80}/_{100}$ rods to a stake and stones [at] the northeast corner of Edward G. Dillingham's land" (the fifth corner). From there, the line travels "north seventeen degrees west, fifty-three and one-half rods to the first mentioned [monument]." The plaintiffs concede that they were unable to find the fifth monument but explain that the Fredettes created a cranberry bog which likely disrupted the monument. The plaintiffs admittedly relied on the distance and bearing calls to the fifth bound, along with the bearing calls back to the first monument to locate the position of the fifth corner in the cranberry bog. In doing so, the plaintiffs maintained the fifth corner angle described in the deed.

The defendants claim the fifth bound is located further to the west and support that location with a partial survey of the land of Edward Dillingham. They contend the judge erred in adopting the plaintiffs' placement of the bound because the plaintiffs made no effort to locate the northeast corner of Edward Dillingham's land, as referenced in the deed to lot 16. While tacitly conceding that their placement of the Dillingham corner is suspect given that their expert did not survey the entire property, including its over one-mile long northern boundary, they contend it was the plaintiff's burden, not theirs, to locate the

---

[9]The defendants point to other alleged inconsistencies in the plaintiffs' placement of the south boundary of 16, suggesting that the placement of lot 16 and lot 20 in relation to lot 28 to the south is erroneous. Nothing in the judge's decision or our decision turns on the location of lot 28, which makes no reference to lot 16 or lot 20.

Dillingham northeast corner and the plaintiffs' failure to do so renders the judge's adoption of the plaintiffs' placement of the western boundary of lot 16 clearly erroneous.

It is true that abutter calls, "statements in a deed that describe the landowner's parcel by reference to the owners of adjoining properties," may be considered monuments. *Paull* v. *Kelly*, 62 Mass. App. Ct. at 674 n.4, 680. Locating the Dillingham parcel on the ground, however, presents issues no less difficult than locating lot 16 on the ground. Only monuments which are certain or capable of being made certain govern over measurements provided in a deed. *Stavros*, 348 Mass. at 258-259. As the plaintiffs' expert explained, the northern boundary of the Dillingham parcel refers only to vague abutter calls without any distance or bearing calls. He further described the southerly line as indescript and stony. Indeed, the judge, after a view, rejected several of the supposed monuments the defendants contend identified the southern boundary of the Dillingham lot. Although the defendants contend the rejection of these monuments constitutes clear error, we will not disturb the judge's findings, particularly where the judge conducted a view and the judge was in "a superior position to appraise and weigh the evidence." *Brandao* v. *Do-Canto*, 80 Mass. App. Ct. 151, 155-156 (2011) (*Brandao*), quoting from *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 161 (1977). The judge indicated that acceptance of stones that the defendants' expert contended marked the southern boundary of Dillingham's land would introduce an "implausible gore between lot 22 (Dillingham's lot) and lot 26 to the immediate south." Dillingham's southern boundary runs some 4,884 feet. In these circumstances, where there was evidence suggesting that the Dillingham northeast corner could not be ascertained with certainty, we cannot conclude that the judge erred in adopting the plaintiffs' proposed boundary even though the plaintiffs did not survey the Dillingham lot to locate its northeast corner.

In conclusion, we agree with the judge that the plaintiffs correctly located the boundary between lot 16 and lot 13, and that the plaintiffs own the disputed property. In the circumstances of this case, resort to the metes and bounds description to locate the fifth bound and, accordingly, the western boundary of lot 16

was appropriate. The approach taken by the plaintiffs comports well, if not perfectly, with the surrounding properties. We note finally that even if it could be said that the defendants' view is plausible, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Brandao, supra* at 155, quoting from *Demoulas,* 424 Mass. at 510.

*Judgment affirmed.*