CHAPMAN vs. PENBSIVY, MISC 18-000283

































 
 NANCY A. CHAPMAN, CHRISTOPHER J. O'BRIEN and MARY E. O'BRIEN, Plaintiffs, v. DARRIN E. PENSIVY and SAHARRA A. PENSIVY, Defendants
 MISC 18-000283 
 JULY 21, 2021
HAMPSHIRE, ss.
SPEICHER, J.
DECISION














 The parties to the present dispute are next-door neighbors in a rural setting in the town of Williamsburg. Notwithstanding the rural setting and large properties owned by each of the parties, their houses are clustered near the Skinnerville Bridge, which provides the only access to the nearest public way. The close proximity of the houses, perhaps, is what led to the present dispute, in which the parties disagree about the boundary line dividing their properties, the rights of the plaintiffs to cross a paved right of way to get to the Skinnerville Bridge, and the rights of the plaintiffs to use an unpaved right of way for access to the rear of their property with motor vehicles. 





 I took a view of the two properties on April 20, 2021, and the case was tried before me by videoconference on April 21, 22 and 29, 2021. Three fact witnesses and two expert witnesses, both surveyors, testified, and forty-four exhibits were admitted into evidence, as well as three chalks, including an extremely well-prepared and helpful flow chart prepared cooperatively by the parties illustrating the chain of title for the subject properties. The parties filed post-trial briefs and requests for findings of fact and rulings of law on July 6, 2021, after which I took the matter under advisement. 





 For the reasons that follow, I find and rule that the boundary between the Chapman and Pensivy properties is the boundary established by the December 17, 1867 deed from Roswell S. Hillman to John Christopher; that the plaintiffs' property is benefitted by a right of way along the south bank of the Mill River to the Skinnerville Bridge; and that the rear portion of the plaintiffs' property, formerly owned by Mack and Coogan, is benefitted by a right of way including the right to the use of motor vehicles. 





FACTS 





 Based on the facts stipulated by the parties, the documentary and testimonial evidence admitted at trial, and my assessment as the trier of fact of the credibility, weight, and inferences reasonably to be drawn from the evidence admitted at trial, I make factual findings as follows: [Note 1]





The Parties and the Properties 





1. Plaintiffs Nancy Chapman, and Christopher O'Brien and Mary E. O'Brien are the owners of the property at 86 Main Street in the Haydenville section of Williamsburg in Hampshire County (the "Chapman property"). Nancy Chapman's parents purchased the property in 1952. 





2. The Chapman property is a parcel of about twenty-four and two-thirds acres; it is bounded on the north by the Mill River, and its only access to a public way is over the Skinnerville Bridge, which crosses the Mill River to access Massachusetts Route 9. From the south side of the bridge, the Chapman property is accessible over a paved right of way running westerly from the bridge along the south bank of the Mill River across the property of the defendants, Darrin Pensivy and Saharra Pensivy. This right of way, referred to by the parties as the "paved right of way" is one of two rights of way in dispute in this action. 





3. The Chapman property is improved by a single-family dwelling, a detached garage, an in-ground swimming pool and a barn, all clustered at the northern portion of the property where it bounds on the Mill River. To the south of the house, barn and garage, there is an unpaved lane running roughly east-west, and to the south of the lane the property slopes sharply uphill to a pasture and woods beyond the pasture. 





4. The house and garage on the Chapman property are accessed by a paved driveway over the paved right of way running along the bank of the Mill River from the Skinnerville Bridge. 





5. Defendants Darrin Pensivy and Saharra Pensivy own the property at 88 Main Street in the Haydenville section of Williamsburg in Hampshire County (the "Pensivy property"). Darrin Pensivy purchased the property in 2001, and Saharra Pensivy became a co-owner in 2010. [Note 2] 





6. The Pensivy property is improved by a single-family dwelling and a detached garage. Aside from the relatively flat area on the north side of the property near the Mill River, where the house and garage are located, the Pensivy property also slopes uphill steeply to the south. 





7. The Pensivy property abuts the Chapman property, with the boundary line between the two properties running north to south from the bank of the Mill River in the vicinity of the Skinnerville Bridge, but with the exact location of the boundary line being one of the contested issues in this case. Regardless of whether the Pensivys or the plaintiffs are correct about the location of the boundary line, in either case, the Chapman property is only accessible from the bridge by crossing over some portion of the Pensivy property. 





8. Notwithstanding the substantial acreage of the Chapman property, given the topography, with the only flat areas of both properties located on the north side near the Mill River and the Skinnerville Bridge, the houses and garages on both properties are located close by each other, and two other houses are located just east of the Pensivy property on smaller lots. All four properties on the south side of the river near the Skinnerville Bridge depend on the bridge for their only access to the nearest public way, Route 9. 





9. In addition to the "paved right of way," there is a second right of way in dispute in this action. Coming off the Skinnerville Bridge, a paved way runs from the bank of the Mill River north to south onto the Pensivy property past the Pensivy house to the west and the Pensivy garage; before reaching the Pensivy garage, the pavement ends and the way continues unpaved, where it runs uphill and wraps around the east side and rear of the Pensivy garage, and past the Pensivy garage where it joins with the unpaved lane on the Chapman property. The lane continues on the Chapman property, uphill from the house, in a westerly direction where it runs past the Chapman house and pool and ends at the bottom of the pasture and in the vicinity of the barn. 





10. As noted above, probably because of the topography, with limited level ground in the vicinity of the bank of the Mill River, notwithstanding the ample acreage of these two properties, the improvements are clustered near to each other on the northern portions of the two properties. The rear yard of the Pensivy house is fenced by a white picket fence, with the outside line of the fence located less than twenty feet from the rear of the Chapman garage. A row of azaleas and rose of sharon bushes, planted by Nancy Chapman, runs roughly parallel to the outside line of the Pensivy's picket fence, only about ten feet away from the fence. 





11. In the last several years, the Pensivys have added two other features to their property that have become the subject of dispute. The Pensivys erected a "storage tent," measuring approximately 25' by 15', westerly of their garage, and to the rear of their fenced-in yard and the Chapman garage. The plaintiffs claim that this tent is located almost entirely on the Chapman property, while the Pensivys claim that the tent is entirely on their property. 





12. In 2016, the Pensivys placed a metal shipping container, about 8 feet in width and 20 feet in length, alongside the side of their garage, in the unpaved right of way, completely blocking the unpaved right of way. [Note 3] 





13. Also in the last several years, Mr. Pensivy placed a section of wooden stockade fencing across the lane on the Chapman property. The Chapmans removed the section of fence. 





Chapman/O'Brien Chain of Title 





14. Common title to both the Chapman and Pensivy properties derives from the title of Roswell S. Hillman. Prior to 1865, Roswell S. Hillman owned all the property owned by the present parties, as well as the two properties to the east of the Pensivy property, presently known as 90 and 92 Main Street. Hillman purchased the property, totaling 31 acres, by a deed dated September 14, 1855, and recorded on September 18, 1855 with the Hampshire County Registry of Deeds ("Registry") in Book 162, Page 438. [Note 4] 





15. On August 5, 1865, Roswell S. Hillman conveyed two parcels, respectively, to Emma Partridge and Margarett Stephens, by deeds recorded with the Registry in Book 229, Page 287 and Book 231, Page 434. These are the present-day 90 and 92 Main Street properties located along the south bank of the Mill River easterly of the Skinnerville Bridge. [Note 5]





16. By a deed dated July 13, 1867, Roswell S. Hillman conveyed about 24 acres of his remaining land to John Mack and John Coogan. The deed was recorded with the Registry in Book 245, Page 15. This 24-acre parcel (the "Mack and Coogan parcel") is the pasture and woodlands portion (also containing the barn) of the present-day Chapman property. The parcel was conveyed with the right of way from the County road to said premises passing between my dwelling House and that of Mrs. Partridge." This right of way is the present-day "unpaved right of way." [Note 6] 





17. On July 15, 1867, two days after conveying the 24-acre parcel to Mack and Coogan, Roswell S. Hillman conveyed most of the present-day Pensivy property to Jerome E. Hillman, who was Roswell's brother. [Note 7] By a deed dated July 15, 1867, recorded with the Registry in Book 246, Page 373, Roswell S. Hillman conveyed to his brother, Jerome E. Hillman, an approximately two-acre parcel of land. [Note 8] The eastern boundary of the conveyed parcel, where it met the remaining land of Roswell, began on the south bank of the Mill River at a point "about two and a half rods above the bridge." [Note 9] Roswell did not reserve an easement across the land conveyed to Jerome to get to the bridge and the county road. Thus, as a matter of record, this conveyance left Roswell's remaining land andlocked, with no access to the bridge and the county road (present-day Route 9) on the other side of the bridge. 





18. Later in 1867, two transactions completed the creation of the present-day Pensivy property. First, by a deed dated December 17, 1867, and recorded with the Registry on December 21, 1867 in Book 248, Page 311, Roswell S. Hillman and his wife Ruth F. Hillman conveyed to John Christopher a 24-foot wide swath of land carved out of the westerly end of his then-remaining land, and running from the bank of the Mill River on the north to land he had conveyed to Mack and Coogan on the south. [Note 10] In this deed Roswell reserved the following right of way: "Reserving the right of way across said premises from a point Westerly from the Offset near the house of said Grantee to land of Grantor." 





19. Then, by a deed dated December 20, 1867, and also recorded with the Registry on December 21, 1867, in Book 248, Page 315, Jerome E. Hillman conveyed all of the land he had acquired from his brother Roswell in July, 1867, also to John Christopher. In this deed Jerome reserved the following right of way for the benefit of his brother Roswell's remaining land: "Also reserving the right of way across said premises to land of R. S. Hillman, commencing at a point near the bridge leading along by the base of the offset in front of the house." [Note 11] 





20. The right of way reserved in the deed from Jerome E. Hillman to John Christopher, and the right of way reserved by Roswell S. Hillman in his simultaneously recorded deed to John Christopher, together comprise the present-day "paved right of way" running east-west between the Skinnerville Bridge along the bank of the Mill River and the Chapman property. The two conveyances recorded simultaneously on December 21, 1867 completed the present-day Pensivy property. 





21. Following the two conveyances recorded on December 21, 1867, Roswell S. Hillman's remaining land was a roughly rectangular parcel, about two-thirds of an acre in size, bounded on the north by the Mill River, on the west and south by the land he had conveyed to Mack and Coogan, and on the east by the land he had conveyed to John Christopher. The present-day Chapman house and garage are located entirely on this parcel. 





22. The remaining land of Roswell S. Hillman (for convenience referred to hereinafter as the "house parcel"), after the two conveyances recorded on December 21, 1867, was landlocked but for the right of way reserved in the two simultaneously recorded deeds. Access to the bridge and the county road on the other end of the bridge was over the right of way reserved by Roswell and Jerome in the two deeds to John Christopher recorded on December 21, 1867. 





23. In 1871, Roswell S. Hillman conveyed the house parcel, on which his dwelling was located, to Aurelia T. Damon, by a deed dated October 26, 1871 and recorded with the Registry in Book 287, Page 335 on November 20, 1871. [Note 12] The boundary call in this deed for the eastern boundary of the parcel being conveyed was an abutter call: [Note 13] "running Southerly on land of John Christopher to land of John Mack and John Coogan about nine rods..." Thus, this boundary call specified that the land he was conveying was bounded on the east by the land he had deeded four years earlier to John Christopher. 





24. There were several intervening conveyances of the house parcel, with no change in its boundaries, leading up to the 1952 conveyance to Nancy Chapman's parents. Aurelia Damon conveyed the house parcel to Joseph T. Gibson by a deed dated October 11, 1881, and recorded with the Registry in Book 366, Page 352. This deed, as did the deed from Hillman to Damon, called out the eastern boundary of the house parcel as "running Southerly on land of John Christopher to land of John Mack and John Coogan about nine rods..." [Note 14] 





25. Gibson, by a deed dated April 24, 1883 and recorded with the Registry in Book 378, Page 437, conveyed the house parcel to John Long. This deed included the identical boundary call for the eastern boundary of the property as did the two previous deeds: "running Southerly on land of John Christopher to land of John Mack and John Coogan about nine rods..." [Note 15] 





26. John Long sold the house parcel to Frances G. Breckenridge by a deed dated July 11, 1904, and recorded with the Registry in Book 585, Page 195. This deed included the same, identical boundary call for the eastern boundary of the house parcel as the earlier deeds, except this boundary call added "now or formerly" when referring to the bounding land of John Christopher. [Note 16] 





27. Breckenridge sold the house parcel to Charles M. Damon by a deed dated October 16, 1917, recorded with the Registry in Book 735, Page 68. This deed, too, described the eastern boundary of the house parcel as "running Southerly on the land formerly of John Christopher to land now or formerly of John Mack and John Coogan about nine (9) rods..." [Note 17]





28. Meanwhile, after intervening conveyances of the 24-acre parcel Roswell Hillman had conveyed to Mack and Coogan in 1867, [Note 18] the 24-acre Mack and Coogan parcel was reunited with the house parcel when Charles Damon acquired this parcel as well by two conveyances in 1932 and 1937. By a deed dated December 14, 1932, and recorded with the Registry in Book 884, Page 254, and a deed dated November 4, 1937, and recorded with the Registry in Book 928, Page 229, respectively fifteen and twenty years after he had purchased the house parcel, Charles M. Damon purchased the "Mack and Coogan" parcel, thus recombining much of Roswell S. Hillman's holdings up until the 1867 conveyances into a parcel of just under 25 acres. [Note 19]





29. In 1952, Charles M. Damon sold the recombined house parcel and Mack and Coogan parcel to Nancy Chapman's parents. Consistently with all the prior deeds of the house parcel, the boundary call for the eastern boundary of the property described this boundary as "running Southerly by the land of Walter E. Emerson, formerly of John Christopher, nine (9) rods more or less..." [Note 20] 





30. Deeds subsequent to the deed into Nancy Chapman's parents have all been within the family, including deeds from Nancy Chapman's parents to her uncle, James McIntyre; a deed from her uncle's estate to Nancy Chapman and her husband; a deed from Nancy Chapman and her husband to Nancy Chapman; and finally, a deed from Nancy Chapman to Nancy Chapman, Christopher J. O'Brien and Mary E. O'Brian. [Note 21] These deeds, consistently with the earlier deeds of the house parcel or the combined house parcel and Mack and Coogan parcel, all have an identical boundary call for the eastern boundary of the property as "running Southerly by the land of Walter E. Emerson, formerly of John Christopher, nine (9) rods more or less..." 





Pensivy Chain of Title 





31. The present-day Pensivy property, with one change, was created by simultaneous recording in December, 1867 of the two deeds by which Jerome E. Hillman conveyed the land he had acquired several months earlier from his brother Roswell to John Christopher, while Roswell conveyed a 24-foot wide adjacent swath to John Christopher, with the western boundary of the 24-foot wide swath forming the new eastern boundary of Roswell's remaining land (the house parcel) and the western boundary of John Christopher's land. These transactions are described in more detail in paragraphs 18 and 19, above. 





32. In 1885, John Christopher conveyed a portion of the land he had acquired in 1867 from Roswell Hillman and Jerome Hillman. By a deed dated May 2, 1885, and recorded with the Registry in Book 394, Page 155, John Christopher conveyed about a quarter of an acre of the southeast portion of his land to Thomas J. Brady. [Note 22] This conveyance has no bearing on the present dispute, as it changed the configuration of the Christopher land on the southeastern side of the property, away from the boundary of the Hillman house parcel. 





33. In 1928, John Christopher's sole heir, Mary J. Riley, deeded John Christopher's property to Jennie M. Welch, by a deed dated May 22, 1928, and recorded with the Registry in Book 845, Page 427. The deed described the western boundary of the property as follows: "on the west by the fence lines at the lands of Charles M. Damon and Thomas J. Brady." The deed further stated that title was derived from "deeds to John Christopher by Jerome Hillman dated December 20, 1867...and by Roswell S. Hillman dated December 17, 1867..." [Note 23] Charles M. Damon had acquired the former Roswell Hillman house parcel in 1917, so the boundary call to "on the west by the fence lines at the lands of Charles M. Damon..." referred to the eastern boundary of the house parcel. 





34. In 1944, the estate of Jennie M. Welch deeded the same property to Walter S. Emerson and Sarah D. Emerson, as tenants by the entirety, by a deed dated September 28, 1944, and recorded with the Registry in Book 985, Page 268. The deed used the same boundary call for the eastern boundary of the property as did the previous deed: "on the West by the fence lines at the lands of Charles M. Damon and Thomas J. Brady." The deed stipulated that it conveyed "the same premises described in deed from Mary J. Riley to Jennie M. Welch..." [Note 24] 





35. Finally, Sarah D. Emerson's estate deeded the property to the defendant Darrin E. Pensivy by a deed dated April 11, 2001, recorded with the Registry in Book 6177, Page 216. The deed repeated the same boundary call for the western boundary of the property: "...and on the West by the fence lines at lands now or formerly of Charles M. Damon and Thomas J. Brady." The deed also stated that it was conveying the same premises as those conveyed by the Jennie M. Welch estate to the Emersons in 1944. [Note 25] Darrin Pensivy conveyed the same property to himself and his wife Saharra A. Pensivy by a deed dated September 23, 2010, recorded with the Registry in Book 10312, Page 236. [Note 26] 





DISCUSSION 





Burden of Proof 





 Both parties to this dispute seek to prove that they have title to the disputed area between the two properties, and they both make claims with respect to two rights of way. The plaintiffs have asserted a claim for declaratory relief with respect to the location of the boundary between the Chapman and Pensivy properties, with respect to their rights to continued use of the paved right of way, and with respect to the nature of their rights with respect to the unpaved right of way. The plaintiffs also seek related relief for the claimed trespass of the Pensivys by placement of a shipping container in the unpaved right of way and a storage tent over the claimed record boundary between the two properties. 





 The plaintiff seeking to establish its title "has the burden of establishing its title and not simply by demonstrating the weaknesses or nonexistence of the defendant's title." Sheriff's Meadow Foundation, Inc. v. Bay-Courte Edgartown, Inc., 401 Mass. 267 , 269 (1987). Here, the parties dispute the proper location of the common boundary line between their properties, the Pensivys dispute the existence of the paved right of way over their property, and the Pensivys dispute whether the unpaved right of way may be used for access to the Chapman property by motor vehicles, and not just for pedestrian travel. For the plaintiffs to succeed, they must prove that the boundary between the land of Roswell S. Hillman and John Christopher, established in a deed from Hillman to Christopher in 1867, is still the boundary between the two present-day properties. To prove the existence of the paved right of way, the plaintiffs must show that they benefit from an express easement, an implied easement, or an easement of necessity. As the Pensivys do not dispute the existence and continued viability of the unpaved right of way, but rather claim that it is overburdened by vehicular traffic, the plaintiffs must prove that the intent of the original grantor of the right of way allowed for the present-day use of the right of way for vehicular traffic. 





I. THE CHAPMAN PROPERTY IS BOUNDED ON THE EAST, AND THE PENSIVY PROPERTY ON THE WEST, BY THE BOUNDARY ESTABLISHED BY THE DECEMBER 17, 1867 DEED FROM HILLMAN TO CHRISTOPHER. 





 The disagreement over the common boundary line between Chapman's and the O'Briens' and the Pensivys' abutting properties is predicated on different interpretations of the descriptions of that boundary in their respective chains of title. Chapman and the O'Briens maintain that the eastern boundary of their land, and thus the western boundary of the Pensivy property, is the boundary established by the December 17, 1867 deed from Roswell S. Hillman to John Christopher. The Pensivys argue that the western boundary of their property is defined by a fence line referred to in their chain of title beginning with the deed from the heir of John Christopher to Jennie M. Welch in 1928. 





 The present-day, on-the-ground location of a boundary that was described in older deeds in the parties' chains of title is a question of fact for determination by the court. Baker y. Miller, 284 Mass. 217 , 222 (1933). In determining the true boundary between the lands of abutting owners, the court may consider "[a]ny competent evidence," and it is for the court to "decide whether upon all the testimony and evidence it [is] more accurate to rely on one expert over another or ancient plans over more recent plans." Bernier v. Fredette, 85 Mass. App. Ct. 265 , 268, citing Holmes v. Barrett, 269 Mass. 497 , 502 (1929). A boundary line does not need to be established by absolute certainty, but "merely by a preponderance of the evidence." Cytrynowski v. McDonald, 24 LCR 502 , 508 (2016) (Foster, J.), affd 92 Mass. App. Ct. 1114 (2017), citing McCarthy v. McDermott, 18 LCR 405 , 406 (2010) (Long, J.). 





 The primary governing principle in interpreting deeds is to give effect to the intentions of the parties. Morse v. Chase, 305 Mass. 504 , 507 (1940). The intent of the parties is to be "ascertained from the words used in the written instrument[s], construed when necessary in light of the attendant circumstances." Sheftel v. Lebel, 44 Mass. App. Ct. 175 , 179 (1998). In the construction of deeds, "where the land conveyed is described by courses and distances and also by monuments which are certain or capable of being made certain[,] the monuments govern," and any non-corresponding courses or distances must yield. Temple v. Benson, 213 Mass. 128 , 132 (1912). "A monument governs [over] measurements, and the land of an adjoining proprietor is a monument, within that rule." Percival v. Chase, 182 Mass. 371 , 377-388 (1903). "[W]hen abutter calls are used to describe property, the land of an adjoining property owner is considered to be a monument." Paull v. Kelly, 62 Mass. App. Ct. 673 , 680 (2004). "The only exception recognized is where, by strict adherence to monuments, the construction is plainly inconsistent with the intention of the parties as expressed by all the terms of the grant." Temple v. Benson, supra, 213 Mass. at 132. If the monument described in the deed cannot be found, "and its location cannot be made certain by evidence, the measurements and other provisions of the deed are controlling." Holmes v. Barrett, supra, 269 Mass. at 500. But if a boundary can be located by the extrinsic evidence of an abutter call in the deed of adjacent property, the abutter call in that deed may be used to locate a boundary. Paull v. Kelly, supra, 62 Mass. App. Ct. at 681 (Land Court judge properly considered abutter call in deed of adjacent property in determining disputed boundary). 





 Here, the question is not a close one. The location on the ground today of the boundary between the two properties as established by the December 17, 1867 deed from Roswell Hillman to John Christopher is not a matter of dispute between the parties. They agree as to the present location of this boundary line. It is shown as the line between points "1" and "2" on the plan prepared by the plaintiffs' surveyor, [Note 27] and the line is shown in the same location on the plan prepared by the defendants' surveyor, on which it is identified as the line between the points "F" and "G" and is further identified as the "plotted location of deeds B245/P273 [the Mack and Coogan deed] and B248/P311" [the December 17, 1867 deed from Roswell Hillman to John Christopher]. [Note 28] The defendants' expert acknowledged, and I so find, that the line between points "1" and "2" on the plaintiffs' plan shows the same line, in the same location, as the line shown between points "F" and "G" on the defendants' plan, and further, that this line is the correctly plotted location of the boundary between Roswell S. Hillman's remaining parcel and the land deeded by Roswell to John Christopher in the December 17, 1867 deed. [Note 29] 





 The dispute, then, lies not in the ability to locate the boundary as established by the December 17, 1867 deed to John Christopher, as the location of this boundary is beyond question. Rather, the Pensivys argue that the boundary subsequently changed, moving to the west by about 15 feet on the south end of the property by the lane, and about 7 feet on the north end by the river bank. They base this argument on references in later deeds in the Pensivy chain of title to the western boundary of the former Christopher land as "on the west by the fence lines at the lands of Charles M. Damon..." They further argue that the "fence lines" referred to in the 1928 deed and all subsequent deeds in the Pensivy chain of title refer to a fence shown on a 1977 sewer easement plan, which fence, they argue, is located westerly of the 1867 Hillman-Christopher boundary and therefore established a new boundary between the Chapman and Pensivy properties starting with the 1928 deed. 





 This argument fails for several reasons. First, the boundary call to a "fence line" exists only in the Pensivy chain of title, and not in the Chapman chain of title. The Chapman chain of title, consistently from the December 17, 1867 deed from Hillman to Christopher, and including every subsequent deed of the Hillman "house parcel," defines the eastern boundary of the house parcel with an abutter call to the land of (or formerly of) John Christopher. As this line is well defined and has not changed, it cannot have moved to the west and shrunk the house parcel and increased the size of the former Christopher parcel. 





 Furthermore, the deeds in the Pensivy title include in their western boundary call not only a reference to "fence lines," but abutter calls "at the lands of Charles M. Damon." These abutter calls are, as stated above, to a line known to be the boundary as established by the December 17, 1867 deed from Roswell Hillman to John Christopher. As the deeds in the Chapman chain of title have consistently and without exception used an abutter call to the land of John Christopher as a monument for their eastern boundary, and as there is no showing (and in fact the defendants do not contend) that the location of this boundary has changed in any of the deeds in the Chapman chain of title, there can be no finding that the location of the boundary between the present properties have changed. 





 I find that the deeds in the Pensivy chain of title are not to the contrary. The 1928 and 1944 deeds, and the 2001 deed to Mr. Pensivy, all use an abutter call to the lands of Charles M. Damon (then or formerly the owner of the house parcel) as part of their western boundary call, and this is consistent with the references to the lands of or formerly of John Christopher in the eastern boundary calls of the deeds in the Chapman chain of title. This abutter call in the Pensivy chain of title takes precedence over the subsidiary call to a "fence line" that, as is discussed below, cannot be adequately located. Thus, there is no disagreement between the deeds in the two chains of title: they each use abutter calls to the same well-defined boundary as established by the December 17, 1867 deed from Roswell S. Hillman to John Christopher. 





 A third reason the Pensivys' argument fails is that they cannot locate the "fence line" referred to for the first time in the 1928 deed. "Artificial land marks or signs such as fences, walls, a line, a building, or a stake and stones, are to be treated as monuments or boundaries." White v. Hartigan, 464 Mass. 400 , 411 (2013), quoting Temple v. Benson, supra, 213 Mass. at 132. However, "[w]hen such a monument is used as a boundary, the boundary 'must be taken to refer to the condition of the land at the time the deed was given.'" Id. Thus, for the "fence lines" referred to in the 1928, 1944 and 2001 deeds in the Pensivy chain of title to be considered as a reliable monument documenting the location of the boundary line between the Pensivy and Chapman properties, the Pensivys would have to present evidence of the location of the fence at the time of each of the deeds, or certainly at least at the time of the 1928 deed, which was the first to use this call. The defendants have failed to present such evidence, while the plaintiffs have presented evidence, which I credit, that the fence claimed by the defendants did not exist on those dates. 





 The Pensivys failed to prove the location of the fence line referred to in any of the deeds in their chain of title at the time of their execution. The only evidence offered by the Pensivys of a fence in the vicinity of the location they claim should be the boundary between the two properties is a fence located on a 1977 sewer easement plan. The Pensivys offer a 1977 sewer easement plan as evidence of the "fence lines along the lands of Charles M. Daron" referred to in the 1928, 1944 and 2001 deeds in the Pensivy chain of title. Indeed, the 1977 sewer easement plan shows a fence in the location the Pensivys offer as a proper boundary between the Chapman and Pensivy properties. [Note 30] The sewer easement plan carries the caveat that it "does not represent a field survey and is intended for easement purposes only." Aside from this caveat, even assuming it accurately shows the location of a fence in 1977, it does not follow, and I do not find, that it establishes the location of a fence at the time of the 1928, 1944 and 2001 deeds in the Pensivy chain of title. 





 The Pensivys offered no evidence of the presence of a fence in 1928 or 1944, and their suggestion that the fence that was present in 1977 was also present in those earlier years was contradicted by the evidence at trial. Evidence presented at trial, which I credit, demonstrates that the fence present in 1977 was not yet present in the 1950s or 1960s, and it was no longer present in the 1980s. Nancy Chapman's parents purchased the property in 1952, and she lived there with her parents as a young child until her mother died in 1958. Ms. Chapman identified her mother in a photograph taken at the property with the Chapman garage in the background looking to the west, toward the present Pensivy property. [Note 31] No fence is apparent in the photograph behind the garage where the sewer easement plan would have it located. Ms. Chapman further testified that she did not remember seeing a fence in that location when she was a child in the 1950s, and that her grandmother lived at the property in the 1960s and she visited every week, and that there was no fence present during the 1960s. [Note 32] I credit her testimony. I also credit the corroborating testimony of Nancy Chapman's co-owner Christopher O'Brien that he did not recall there ever being a fence at that location since he became familiar with the property in the 1980s. [Note 33] Photographs taken in the 1980s at the same location corroborate the testimony of both Ms. Chapman and Mr. O'Brien, showing, as I so find, that the fence that may have been present in 1977 was no longer present by the time the photographs were taken in the 1980s. [Note 34] 





 The "fence lines" as offered by the Pensivys may not be relied on to establish a boundary for an additional reason. Even if the "fence lines" referred to in the Pensivy chain of title were proved to be have existed at the times of execution of the 1928 and 1944 deeds, west of the boundary established by the December 17, 1867 deed, such a boundary call would be ineffective. Since neither Roswell S. Hillman, Charles Damon nor any other subsequent owner of the house parcel deeded out any additional land from the eastern portion of the house parcel, to John Christopher or any subsequent owner of the Christopher property, any attempt on the part of any subsequent owner of the Christopher property to deed to a subsequent grantee land west of the December 17, 1867 boundary would be ineffective. [Note 35] If the 1928 deed or the 1944 deed of the Christopher property truly was intended to convey to "fence lines" that lay farther west than the boundary established in 1867, neither deed could accomplish such a feat because that additional land had never been conveyed into the Christopher chain of title. 





 Any such attempt to convey land not owned by the grantor would be as ineffective as the proverbial attempt to record a deed to the Brooklyn Bridge. "There is nothing magical in the act of recording an instrument with the registry that invests an otherwise meaningless document [one that purports to convey title to land not owned by the grantor) with legal effect." Bevilacqua v. Rodriguez, 460 Mass. 762 , 771 (2011). Simply put, "whatever the intent, one may not grant what one does not own..." Kitras v. Town of Aquinnah, 64 Mass. App. Ct. 285 , 292 (2005), quoting in part Richards v. Attleboro Branch R. Co., 153 Mass. 120 , 122 (1891). "[I]t is an elementary principle of law, that a person cannot grant or convey property of which he is not possessed, and to which he has no title." Gardner v. Hooper, 69 Mass. 398 , 400 (1855). 





 For the reasons stated above, if there was a fence line westerly of the boundary established by the December 17, 1867 deed, (which I find there was not) it did not take priority over the abutter calls to the Christopher and Damon properties in both chains of title. 





II. THE PLAINTIFFS HAVE AN EASEMENT OVER THE PAVED RIGHT OF WAY. 





 When Roswell S. Hillman conveyed the bulk of what is today the Pensivy property to his brother Jerome Hillman in July, 1867, he did not reserve an express easement over the conveyed land to the Skinnerville Bridge to prevent his remaining land from becoming landlocked. Later that year, when Roswell Hillman sold an additional 24-foot wide swath of his land to John Christopher, he did reserve an easement over this parcel to allow him to get to the land he had sold to Jerome. At the same time, Jerome conveyed the land he had acquired earlier that year from his brother Roswell, to John Christopher. Jerome, in his deed to John Christopher, reserved an express easement for the benefit of Roswell's remaining land. Together, the two reserved easements provided access from Roswell's remaining land to the Skinnerville Bridge and to the county road (Route 9). 





 This combination of implied and express easements provided access from the "house parcel" to the Skinnerville Bridge, that has provided the access from the house parcel from 1867 to the present. I find that Roswell intended to reserve an easement to preserve his access to the Skinnerville Bridge when he deeded out his land to his brother Jerome, and that this intent was effected by the reservation of an implied easement. I further find that Roswell and Jerome effectively and successfully reserved an express easement for the benefit of Roswell's remaining land in the two simultaneous conveyances to John Christopher recorded on December 21, 1867. 





 A. Roswell Hillman's Remaining Land Benefitted from an Implied Easement Over the Land He Conveyed to His Brother Jerome. 





 The plaintiffs assert that the paved right of way that provides access between the Skinnerville Bridge and the house parcel portion of the Chapman property was first reserved by implication at the time of the conveyance from Roswell Hillman to his brother Jerome Hillman in July, 1867. That conveyance, if no easement was reserved, would have left Roswell's land, on which he resided, with no access to the Skinnerville Bridge and the county road, leaving Roswell landlocked. The plaintiffs argue that this could not have been the intent of Roswell at the time he conveyed his land to Jerome, and that Roswell and Jerome intended to, and did, include in their transaction, an implied easement for the benefit of Roswell's remaining land. The court agrees. 





 "An implied easement arises when no easement appears in the record of a conveyance, but 'there is evidence tending to show an intent of the parties'" to create such an easement. Alexander v. Juchno, 21 LCR 621 , 632 (2013) (Foster, J.), quoting Mt. Holyoke Realty Corp. v. Holyoke Realty Corp., 284 Mass. 100 , 104 (1933). "[I]mplied easements, whether by grant or reservation, do not arise out of necessity alone. Their origin must be found in a presumed intent of the parties, to be gathered from the language of the instruments when read in the light of circumstances attending their execution, the physical condition of the premises, and the knowledge which the parties had or with which they are chargeable." Dale v. Bedal, 305 Mass. 102 , 103 (1940). See also, Labounty v. Vickers, 352 Mass. 337 , 344 (1967). "The burden of proving the existence of an implied easement is on the party asserting it." Reagan v. Brissey, 446 Mass. 452 , 458 (2006). 





 The circumstances attending to the execution of the July, 1867 deed from Roswell Hillman to Jerome Hillman include the fact that they were brothers, and the fact that Roswell's remaining land would be left without access to the Skinnerville Bridge and the nearest public way if he was left with no ability to cross over the land he was conveying to his brother Jerome. The parties to that transaction are chargeable with the knowledge that Roswell's remaining parcel would be landlocked without access to the Skinnerville Bridge across the land conveyed to Jerome. Further evidence that this is the case is Jerome's reservation of an express easement for the benefit of his brother's land just a few months later when he conveyed the parcel to John Christopher. I infer from the express easement reserved in December, 1867 for the benefit of his brother Roswell, Jerome was formalizing an implied easement that he and his brother had honored between them upon Roswell's conveyance to Jerome in July, 1867. 





 Based on these circumstances existing at the time of the execution of the deed signed in July, 1867, as well as the deeds signed in December, 1867, I find that the parties to the July, 1867 deed by which Roswell deeded property to Jerome, intended to and did in fact reserve an easement by implication across the land conveyed to Jerome Hillman, for the benefit of Roswell Hillman's remaining land, in the location of the present paved right of way along the south bank of the Mill River. 





 B. Roswell Hillman's Remaining Land Benefitted from an Express Easement Over the Land He Conveyed to John Christopher and Over the Land Jerome Conveyed to John Christopher. 





 The plaintiffs claim that they benefit, as well as from the implied easement reserved by Roswell Hillman upon his conveyance to his brother Jerome, from an express easement reserved over the land conveyed to John Christopher in the two deeds recorded simultaneously on December 21, 1867. The Pensivys make the argument that the express easement reserved across the land of John Christopher to the remaining land of Roswell Hillman was ineffective because Roswell Hillman was not named as a grantee in the deed between Jerome Hillman and John Christopher. Ordinarily, this argument would be correct. "'An easement cannot be imposed by deed in favor of one who is a stranger to it.'" Hodgkins v. Bianchini, 323 Mass. 169 , 172 (1948), quoting Hagen v. Mathews, 184 Mass. 388 , 393 (1903). Here, however, the deed by which Jerome Hillman reserved an easement over the land granted to John Christopher to the remaining land of Roswell Hillman was part of one transaction in which two deeds were recorded simultaneously. 





 The two deeds by which John Christopher's land was compiled were dated three days apart, December 17 and 20, 1867, but they were recorded together. Both deeds were recorded on December 21, 1867, literally just two minutes apart (4:42 P.M. and 4:44 P.M.), and they were recorded consecutively, at Pages 311 and 315 of Book 248. And, of course, the two deeds conveyed adjacent parcels from related grantors, who were brothers, to the same grantee, John Christopher. Under these circumstances, I find that the two deeds were part of one transaction, with the parties to the two deeds all part of that one transaction."[W]hen two or more deeds, conveyances, or contracts of any sort are made simultaneously, and so connected with each other that they may be regarded as one transaction, these contracts and conveyances shall be held to take effect in such order of priority and succession as shall best carry into effect the intention and best secure the rights of all the respective parties." Pomeroy y. Latting, 81 Mass. 435 , 436 (1860). "All the respective parties" in the case of this transaction included Roswell Hillman and Jerome Hillman, who were the two grantors in the transaction, and John Christopher, who was the grantee in both deeds. The combination of easements reserved in the two deeds indicate the clearly expressed intent of all three parties to the two simultaneously recorded deeds in this one transaction to reserve an express easement across the two parcels being conveyed to John Christopher for the benefit of the remaining land of Roswell Hillman. As Roswell Hillman was not a stranger to the transaction, but was in fact one of the grantors in this single transaction involving two deeds, the reservation of an express easement across both of the conveyed parcels was appropriate and effective. This transaction formalized the implied easement reserved several months earlier when Roswell Hillman conveyed property to Jerome Hillman, and this reservation of easement for the benefit of the Hillman "house parcel" remains in effect today. 





III. THE PLAINTIFFS' EASEMENT OVER THE UNPAVED RIGHT OF WAY INCLUDES VEHICULAR TRAFFIC. 





 The Pensivys do not contest the continued vitality of the "unpaved right of way," which runs south from the Skinnerville Bridge, and turns west around the side and back of the Pensivy garage, and connects with the lane on the Chapman property. [Note 36] Rather, they argue that it is overloaded by using it to access the house parcel portion of the Chapman property instead of just the former Mack and Coogan parcel for which it was granted; and they further argue that it is overburdened by the use of motor vehicles, and was intended to be limited to pedestrian use only. The plaintiffs agree that the unpaved right of way was granted to provide access to and egress from the Mack and Coogan parcel portion of their property, and was not intended to benefit the Hillman "house parcel" portion of their property. I agree and so find that whatever the scope of the easement, it does not include a right of access to the house parcel portion of the Chapman property, but only to the former Mack and Coogan parcel. The permissible intensity of use of the right of way to access that portion of the Chapman property is the only question that remains to be answered. 





 The language used by Roswell Hillman to grant the unpaved right of way to Mack and Coogan when he conveyed the 24-acre pasture and wooded parcel in 1867 was as follows: "Also the right of way from the County road to said premises passing between my dwelling House and that of Mrs. Partridge." [Note 37] This is a grant of easement expressed in general terms, with no specified limitations. 





 The law in Massachusetts is well-settled that an easement granted in general terms, and without express limitation or restrictions, is available for the reasonable uses to which the dominant estate may thereafter be devoted. Marden v. Mallard Decoy Club, 361 Mass. 105 , 107 (1972). "In the absence of express limitations, such a general right of way obtained by grant may be used for such purposes as are reasonably necessary to the full enjoyment of the premises to which the right of way is appurtenant." Tehan v. Security Nat'l. Bank of Springfield, 340 Mass. 176 , 182 (1959), citing Parsons v. New York, New Haven & Hartford Railroad Co., 216 Mass. 269 , 273 (1913). 





 An easement granted in general terms is available for all reasonable, consistent uses, and those uses may change over time. Lawless v. Trumbull, 343 Mass. 561 , 563 (1962); Hayes v. Inniss, 83 Mass. App. Ct. 1138 (2013) (Rule 1:28 Unpublished Decision) (once an easement is created, every right necessary for its enjoyment is included by implication). In Hodgkinds v. Bianchini, the Supreme Judicial Court found that an easement for a "cart road to pass to and from the main street" was not restricted to "use to horse drawn vehicles or limit[ed]... to the width of vehicles then in common use." 323 Mass. 169 , 172 (1948). Similarly, a right of way grant originally used only to access a cottage and barn by foot and carriage, later encompassed uses by motor vehicles to access a four-car garage. Mahon v. Tully, 245 Mass. 571 , 573 (1923). 





 Overburdening comes into play where the use of the easement exceeds what is allowed by right. Swensen v. Marino, 306 Mass. 582 ,583 (1940). Here, the right of way is granted in general terms and contains no limiting language, as, for instance, limiting travel to pedestrian travel, or explicitly prohibiting the use of the right of way by motor vehicles. Such general language granting a right of way with no specific specified limitations is for "'an easement for all purposes of ingress and egress common to a way.'" Reynolds v. Hyman, 86 Mass. App. Ct. 1123 , at p. 2, fn. 13 (2014), quoting Deacy v. Berberian, 324 Mass. 321 ,327 (1962). Accordingly, use of the unpaved right of way by motor vehicles is completely consistent with the general right of way granted in 1867. Such use of the unpaved right of way does not overburden the right of way. 





CONCLUSION 





 For the reasons stated above, I find and rule that (1) the boundary between the Chapman and Pensivy properties is the boundary established by the December 17, 1867 deed from Roswell S. Hillman to John Christopher; (2) the "house parcel" portion of the Chapman property is benefitted by an express and implied easement over the paved right of way to and from the Skinnerville Bridge over the Pensivy property; and (3) the unpaved right of way is not overburdened by its use by motor vehicles for access to and egress from the former Mack and Coogan portion of the Chapman property. 





 Prior to the entry of judgment, the plaintiffs are ORDERED to submit to the court, within thirty days of the date of this decision, a stamped plan, in size and format suitable for attachment as an exhibit to the judgment, showing the property line and the two rights of way as determined by the court in this decision. The plan shall be submitted to the defendants prior to submission to the court, and if the parties are unable to agree on the accuracy of the plan, the parties are to so inform the court and a hearing will be held on the suitability of the plan. 





 Judgment will enter accordingly following approval of a judgment plan and will include an order for the removal of the existing encroachments on the Chapman property and obstructions on the unpaved right of way, including the storage tent and the shipping container. 





FOOTNOTES
[Note 1] Additional findings of fact are contained in the discussion section, infra. 

[Note 2] Exhibit ("Exh.") 29, deed dated April 11, 2001, recorded with Hampshire County Registry of Deeds, Book 6177, Page 216; Exh. 32, deed dated September 23, 2010, recorded in Book 10312, Page 236. 

[Note 3] At the conclusion of the evidence, the Pensivys having failed to present any evidence of the extinguishment or abandonment of the unpaved right of way, I ordered, sua sponte, the removal within thirty days of the metal shipping container. 

[Note 4] Exh. 1. 

[Note 5] Exh. 2, 3. 

[Note 6] Exh. 4. 

[Note 7] Exh. 44, Genealogy of the Hillman Family, pp. 19-22; Transcript ("Tr.") Vol. II, pp. 12-15. 

[Note 8] Exh. 5. 

[Note 9] Id.; Two and a half rods equals 41.25 feet. 

[Note 10] Exh. 6. 

[Note 11] Exh. 7. 

[Note 12] Exh. 9. 

[Note 13] "Abutter calls are statements in a deed that describe the landowner's parcel by reference to the owners of adjoining properties." Paull v. Kelly, 62 Mass, App. Ct. 673, 674, fn. 4 (2004). 

[Note 14] Exh. 13. 

[Note 15] Exh. 15. 

[Note 16] Exh. 17. 

[Note 17] Exh. 18. 

[Note 18] Exh. 11, Deed from John Mack to John Coogan, dated June 18, 1873, recorded with the Registry in Book 304, Page 157; Exh. 14, Deed from John Coogan to Martin L. Sornborger, recorded with the Registry in Book 372, Page 181. 

[Note 19] Exh, 21, 22. 

[Note 20] Ex. 24, Deed of Charles M. Damon and Eva W. Damon to Anthony Krzynowek and Julia Krzynowek, dated July 31, 1952, recorded with the Registry in Book 1123, Page 389. 

[Note 21] Exhs. 25, 28, 30 and 31. 

[Note 22] Exhs, 16, 36. 

[Note 23] Exh. 20. 

[Note 24] Exh. 23. 

[Note 25] Exh. 29. 

[Note 26] Exh. 32. 

[Note 27] Exh. 34, "Plan of Disputed Property Line and Rights-of-Way in Williamsburg, Massachusetts," prepared by Homberg & Howe, dated May 10, 2018. 

[Note 28] Exh. 36, "Plan of Disputed Boundary Between Darrin E. & Saharra A. Pensivy and Nancy A. Chapman & Christopher J. O'Brien, Town of Williamsburg, Hampshire County, Massachusetts," prepared by Sackett Survey Services, Inc., dated December 16, 2019. 

[Note 29] Tr. Vol. II, p. 76. 

[Note 30] Exh. 33, "Easement Plan - Route 9, Sanitary Sewers, Board of Selectmen, Williamsburg, Mass., " September, 1977, recorded with Registry in Plan Book 109, Page 90 at Page 97. 

[Note 31] Exh. 38A. 

[Note 32] Tr. Vol. III, pp. 10, 13. 

[Note 33] Tr. Vol. II, pp. 18-19. 

[Note 34] Exhs. 38B, 38C, 38D and 38E. 

[Note 35] The Pensivys have not asserted by counterclaim or otherwise, nor would the facts as shown at trial support, a claim of adverse possession or prescriptive easement with respect to the disputed area between the two purported boundaries. The Pensivys purchased their property less than twenty years before the filing of the present action, were not familiar with the property before they purchased it (Tr. Vol. II, p. 163), and offered no evidence of the adverse use of the disputed area by their predecessor prior to their purchase. See Pensivys' Answer and Affirmative Defenses. Therefore, their claim to the disputed area between the two purported boundaries must be based solely on the record title. 

[Note 36] Their answer to the complaint includes an affirmative defense asserting that the unpaved right of way "has been abandoned, and as such, extinguished." However, the Pensivys rightly concede, and I so find, that they presented no evidence sufficient to establish this defense. 

[Note 37] Exh. 4. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.